825 A.2d 1078

Reccardo WILLIAMS, II

v.

STATE of Maryland.

No. 69, Sept. Term, 2002.

Court of Appeals of Maryland.

June 13, 2003.

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Rachel Marblestone Kamins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, BATTAGLIA, CLAYTON GREENE, JR., (specially assigned), THEODORE G. BLOOM, (retired, specially assigned), JJ.

WILNER, J.

A jury in the Circuit Court for Prince George's County, convinced that petitioner was the person who shot and killed Noraldo Sterling and terrorized his family, convicted him of first degree felony murder and a number of associated offenses, for which he was sentenced to an aggregate of life imprisonment plus ninety years. That judgment was affirmed by the Court of Special Appeals.

The sole issue before us is whether the trial court erred in denying his motion to suppress certain statements he made to the police following his arrest on other charges. That issue requires us to examine the interplay between Maryland Rules 4–212(e) and (f) and Maryland Code, § 10–912 of the Courts and Judicial Proceedings Article. The Rules require that, upon arrest, an accused must be taken before a District Court Commissioner without unnecessary delay and in no event later than 24 hours after the arrest. The statute provides that a confession may not be excluded from evidence solely because

the defendant was not taken before a judicial officer within that time, but rather "is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession." We shall reverse the judgment of the Court of Special Appeals.

## BACKGROUND

Because we are dealing with a ruling on a suppression motion that was not revisited at trial, we shall recount the relevant evidence from the hearing on that motion.

In the early morning hours of July 30, 2000, two 7–Eleven stores in Prince George's County were robbed, at gunpoint, within an hour of each other. Petitioner was arrested at 4:10 that morning as a suspect in both robberies. The arrest occurred after a high speed chase that culminated in petitioner's losing control of his car and crashing into a brick wall. Unfazed by the collision, he exited the car and fled on foot. The arrest was effected when a police dog discovered him hiding in some bushes and bit him on the left shoulder and right forearm.

Upon his apprehension, petitioner was transported by ambulance to Prince George's County Hospital, where his wounds were bandaged and he was given a painkiller. While at the hospital, petitioner told Officer Corridean, who had made the arrest, that his name was Allan Williams, and he gave an address and date of birth. Upon petitioner's discharge from the hospital, Corridean transported him, still clad in a hospital gown, to a county police station, where he was turned over to Detectives Thrift and Cheeks, of the robbery unit. Corridean informed the detectives that the suspect's name was Allan Williams and delivered to them the property petitioner had on his person—approximately $400 in cash and a pay stub. The pay stub was for a Reccardo Williams, whom petitioner said was his brother.

At about 9:25 a.m., petitioner was placed in an interview room located within the robbery unit. Ten minutes later, Thrift entered the interview room and conducted an "initial

interview." He obtained a name—Allan Williams—date of birth, address and other pertinent information from petitioner. Thrift testified that, although he detected the odor of alcohol, petitioner "understood everything that was going on." Thrift left the interrogation room to obtain verifying information from the computer, but the computer system was not functioning. He then spoke with the officers who had transported petitioner.

Thrift reentered the interrogation room with an Advice of Rights and Waiver (ARW) form. He stated that he wanted to get petitioner's side of the story, read the ARW form to petitioner, and had petitioner put his initials next to each right, as it was read to him, in order to affirm that he understood those rights. Petitioner said that he was willing to waive them, and, at 10:30 a.m., he signed the ARW form.

Questioning then began concerning the two 7–Eleven armed robberies. Petitioner quickly confessed orally to both robberies but declined to write a statement because his body hurt and his right hand was taped. With his consent, Thrift began writing his statement concerning the first 7–Eleven robbery at 10:35 a.m.—the questions posed and the answers given. Petitioner initialed each answer and also signed the bottom of each page. As he began to sign the bottom of the third page, he wrote an "R" but then scratched it out and signed his name as "Allan [Williams]." At no time did petitioner indicate that he did not want to talk to Thrift or that he wanted to speak with an attorney.

When the first statement was completed, Thrift took a break and checked the name Allan Williams in the computer. There was an Allan Williams, but the information pertaining to that person did not match the information provided by petitioner. Thrift then entered the name Reccardo Williams—the name on the pay stub taken from petitioner—and, although the date of birth for Reccardo Williams did not match that given by petitioner, there was a physical description provided that did match. The information obtained also revealed that Reccardo Williams was wanted for three homi-

cides in Prince George's County—those involving John Cook, Curtis Pelt, and Naroldo Sterling.

After searching the database, Thrift went back to the interrogation room to obtain a statement concerning the second 7–Eleven robbery. At 11:40 a.m., Thrift began to write the suspect's second statement, which was taken in the same manner as the first one. Petitioner initialed next to each written answer and signed the bottom of each page. At no time while giving this second statement did petitioner indicate that he did not want to speak with Thrift or that he wanted an attorney. Nor did Thrift make any threats, promises, or inducements. Upon completion of the second statement, petitioner asked for a soda and, after complying with his request, Thrift, at about 1:13 p.m., turned petitioner over to Detective Wilson of the homicide unit.

Wilson was the lead detective investigating the July 21, 2000 murders of Cook and Pelt. He was aware that Williams had been arrested in the early morning hours and had been treated at the hospital for his injuries. Wilson also discovered that an arrest warrant had been issued for petitioner concerning the murder of Sterling, the case now before us. Williams was transported from the robbery unit to the homicide unit and placed in an interview room, which was an area that was, at best, 8 feet by 8 feet. It had carpeting on the floor and walls, one door with a peephole but no windows and no access to a bathroom. Petitioner's handcuffs were removed. After petitioner declined an offer of food and drink, Wilson left the room for a few minutes.

When Wilson returned to the interview room at 1:23 p.m., he asked the petitioner if he had been drinking or had used any drugs the night before, to which he responded in the negative. Wilson said petitioner "appeared very calm in my initial contact with him. He did not appear to be under the influence of anything." He never complained to Wilson about his injuries or about being in pain.

Although Wilson was aware that petitioner had been read his *Miranda* rights, he asked him to repeat what he remem-

bered his rights to be. After petitioner completed the recitation, Wilson informed him that he had the right to answer questions without a lawyer and that he could stop the questioning at any time and request an attorney. Satisfied that petitioner understood his rights, Wilson began questioning him about the Cook and Pelt shootings. After petitioner was told that there was "undeniable proof" of his complicity in those shootings, petitioner lowered his head, began to cry, and admitted to the murders. Although Wilson lied about the evidence against petitioner, he never made any threats, promises, or inducements in order to obtain the confession. After his admission, petitioner asked for a drink and Wilson left to get him a soda at 3:46 p.m.

Upon his return to the interview room, Wilson said that he had been advised by another detective that petitioner had been identified by witnesses in the Sterling murder case, whereupon petitioner orally confessed to that murder as well, explaining it as a botched robbery attempt. He then informed Wilson that he was hungry, and Wilson left the room and asked another detective to get some food. Wilson provided the food at 5:24 p.m., and at 6:10 p.m., petitioner used the bathroom. Upon petitioner's return to the interview room, Wilson asked Detective Bernard Nelson to obtain a written statement from him.

Nelson was aware that petitioner had been in custody since about 4:00 a.m. and that he had been injured in a car accident. Nelson entered the interview room at 6:31 p.m., found petitioner lying on the floor, and asked if he would sit in a chair so they could discuss the shootings being investigated by the police. Nelson presented him with an ARW form, determined that he could read and write English, had him read several lines, and then read the form to him. Petitioner waived his *Miranda* rights at 6:38 p.m.

Nelson told petitioner that a witness had identified him in the Sterling shooting and that he needed to start off "on the right foot" by telling his side of the story. Petitioner confessed to Nelson and agreed to provide a written statement. At

no time did petitioner indicate that his body or hand hurt or that he could not write. Nelson gave him paper and a pencil and left the room. When he looked back in at 7:10 p.m., he noticed that petitioner was not writing. Nelson reentered the room and asked why petitioner was not writing; petitioner said he did not know. Nelson told him that his side of the story needed to be written so his story would not get "twisted." Petitioner then began to write a statement at 7:40 p.m. At his request, he was provided with a cigarette and some water.

An hour after petitioner began writing, he knocked on the door and indicated to Nelson that he had finished his statement. Nelson then entered the room, read the statement, and engaged in a question and answer session with petitioner. Nelson would write the question, and then write petitioner's response. Petitioner also drew a picture of the set-up of the house where the Sterling shooting took place and indicated his route through the house. Nelson's notes indicated that petitioner was provided with a cigarette at 9:15 p.m. and that at 9:17, he was asked if he wanted anything to eat, to which he replied in the negative. This question and answer period concluded at 9:57 p.m.

At 9:58 p.m., petitioner began writing a 10–page statement about the Cook/Pelt shootings. At 10:10 p.m., he was provided with a cigarette and a soda, and at 10:44 p.m. he knocked on the door to indicate that he was finished writing the second statement. At 10:46 p.m., Nelson reentered the interview room and asked petitioner four follow-up questions about the Sterling shooting, finishing at 10:53 p.m. Nelson then asked follow-up questions concerning the Cook/Pelt shootings, finishing at 12:13 a.m. on July 31, 2000. Petitioner reviewed and initialed the answers on both the Sterling and Cook/Pelt shooting follow-up statements, completing this task at 12:20 a.m. Shortly after that, Nelson left to go home. Petitioner remained in the interview room.

At 7:00 the next morning, Detective Michael Burns, who had been assigned to the Sterling shooting, arrived for work and

found petitioner lying on the floor of the interview room. The log sheet on the outside of the interview room indicated that petitioner had not been interviewed since midnight. Burns entered the interview room at 8:50 a.m., introduced himself, offered petitioner the opportunity to use the bathroom, and gave petitioner breakfast. He took note that petitioner "was injured, his bottom lip was puffed out, and he was in a white hospital gown." Burns asked petitioner about his injuries and asked him if he had received any medication and if he was in pain. Petitioner said that he had been given a painkiller the night before and that he did not need any additional medication.

Burns then left the room to read over the statements petitioner had made to Detectives Nelson and Wilson. At 10:21 a.m., Burns entered the interview room and, without any additional advice as to his *Miranda* rights, began questioning petitioner about the Sterling murder. Burns questioned petitioner about who was with him when the Sterling shooting occurred. Although at first reluctant, petitioner eventually gave Burns a lengthy oral statement regarding the shooting in this case, and named an accomplice, "Cash," a/k/a James Green.

At 12:39 p.m., Burns and his sergeant took petitioner in a police van to look for Green's residence at the Kent Village Apartments. Petitioner was still wearing the hospital gown. At 12:50 p.m., having failed to locate Green's residence, Burns returned petitioner to the police station and provided him with lunch. At 1:04 p.m., petitioner made a photographic identification of Green and then ate his lunch. After lunch, petitioner asked to speak with Detective Nelson.

At 3:39 p.m., Nelson entered the interview room. Petitioner said that he had not told him the entire truth about the Sterling murder. He asked Nelson to have Detective Burns reenter the room so he could tell them the names of the other individuals who were involved. Petitioner then provided the additional information and agreed to provide another written statement. Prior to giving the statement, petitioner was

taken to the bathroom, given another cigarette, and offered food. At 4:08 p.m., after declining the food offer, petitioner began to write his statement. At no time did he indicate that he was in any pain.

After petitioner completed his nine-page statement, Nelson conducted a follow-up written question and answer session. Petitioner placed his initials next to each answer and signed the bottom of every page of the statement. At 5:03 p.m., he was given another cigarette; the entire statement was completed at 5:51 p.m. At 6:17 p.m., petitioner declined an offer of dinner. At 7:15 p.m., he was provided with a cigarette and at 7:30 p.m., he asked to call his girlfriend, which he was permitted to do. At 8:30 p.m., Nelson took petitioner to "District 3" for "processing." He was not presented to a District Court Commissioner until 3:07 a.m. on August 1, 2000, some 47 hours after his arrest.

Upon his indictment, petitioner moved to suppress the various statements he had made, claiming that they were involuntary. Altogether, five written statements were at issue: (1) the statement regarding the first 7–Eleven robbery that was begun at 10:35 a.m. on July 30; (2) the statement regarding the second 7–Eleven robbery that was begun at 11:40 that morning; (3) the statement concerning the Sterling murder that was begun, finally, at 7:40 p.m. on July 30; (4) the statement concerning the Pelt/Cook murders that was begun at 9:58 p.m. on July 30; and (5) the last statement, concerning the Sterling murder, begun at 4:08 p.m. on July 31.

The court denied the motion. It recognized that the 47–hour delay in presentment was one of the factors to be considered in determining the overall voluntariness of the statements but ultimately concluded that "delay in presentation in this particular case was not actually caused by coercive contact, but actually, to the contrary, the fact that the defendant was cooperating in so many cases and providing them with fruitful information, that the police were basically taking advantage of striking while the iron was hot. . . ." In reaching that conclusion, the court considered that, over a nine-hour

period, petitioner had made five written statements, all after receiving appropriate *Miranda* warnings and all after any requests for food, drink, or bathroom visits had been granted. The court did not find conclusive the fact that, at one point, petitioner admitted to having consumed a pint of cognac, noting that he was lucid enough to give a false name. All five statements were admitted into evidence, along with testimony from Detectives Thrift, Wilson, Nelson, and Burns concerning the statements. The Court of Special Appeals agreed with the trial court's conclusion that "the length of time the appellant was questioned did not coerce the statements from him." *Williams v. State*, Ct. of Spec. Appeals of Md., No. 671, Sept. Term 2001, unreported opinion at 23.

## DISCUSSION

### Introduction

Petitioner makes two basic arguments. First, he contends that, although the statute may serve to preclude suppression of a confession solely because of a violation of the time requirement of the presentment rule, it does not preclude suppression where the violation is not merely an incidental one. He argues that where

> "the facts of a case show that police chose to delay presentment unnecessarily, and to deliberately flout the rule in order to interrogate a defendant, a court has the authority under the statute to suppress the statement for violation of the rule, even where the resulting statements meet the traditional test of voluntariness under the common law or constitution."

We reject that argument. The test under the statute, and under the Constitution, remains voluntariness. Deliberate violations of the rule, as we shall explain, bear heavily on whether a resulting statement is voluntary, but they do not, of themselves, form an independent basis for rendering inadmissible a statement that is otherwise voluntary and admissible. To conclude otherwise would be tantamount to ignoring the

statute, which, in the absence of some Constitutional defect, we are not permitted to do.

Petitioner also argues that the court erred in finding the statements to be voluntary. He pieces together the delay and the circumstances of the delay, and, characterizing his stay in the homicide unit interrogation room as "unacceptably coercive and inhumane," contends that,

> "[i]f it is not unreasonably coercive to delay presentment of an injured defendant for nearly two days, to keep him in a windowless room clad only in a hospital gown, with his only rest on the floor, and to do so solely for the purpose of creating a coercive atmosphere in which to obtain a confession, then the prompt presentment rule is truly meaningless, and the due process limitations on interrogation, a sham."

Although possessing more than a grain of truth, that statement stretches the facts a bit and, for that reason, is unacceptable. We do believe, however, that the trial court gave insufficient weight to the continued and unlawful detention of petitioner following his statements regarding the two robberies. We shall conclude that, while the statute makes a delay in presentment only one factor in determining voluntariness and admissibility, not all factors that may weigh on voluntariness are necessarily equal in import, and that, when the delay is not only violative of the Rule but deliberate and designed for the sole purpose of soliciting a confession, it must be given very heavy weight. There is no indication that, with respect to the statements regarding the three murders, the trial court gave the continued delay such weight. When we do so, it becomes clear that those latter statements were involuntary and therefore inadmissible.

### Derivation of the Rule and the Statute

As far back as 1893, the Court held, as a matter of common law, that, when officers made an arrest, "[i]t was their duty *at once* to take the offender before a justice of the peace, to be dealt with according to the direction of the statute." *Twilley*

*v. Perkins,* 77 Md. 252, 265, 26 A. 286, 289 (1893) (emphasis added). Three years later, in *Kirk v. Garrett,* 84 Md. 383, 405, 35 A. 1089, 1091 (1896), the Court observed that, "[f]rom the earliest dawn of the common law," a constable who had properly arrested a person "was authorized to detain the suspected party such a reasonable length of time as would enable him to carry the accused before a magistrate," and confirmed, as beyond cavil, that "it becomes the duty of the officer or the individual making the arrest to convey the prisoner in a reasonable time and without unnecessary delay, before a magistrate to be dealt with as the exigency of the case may require." *Id.* at 407, 35 A. at 1092.

We observed in *Johnson v. State,* 282 Md. 314, 319–20, 384 A.2d 709, 712 (1978), that common law duty, invoked in the context of civil cases for false imprisonment, had spawned legislation, applicable in Baltimore City and Montgomery County, guaranteeing suspects in criminal cases the right of prompt presentment, and that, upon the creation of the District Court in 1971, we incorporated that right into the first Maryland District Rules and thus made it Statewide in application. We noted that, as initially drafted, the Rule that first became Maryland District Rule 709a. tracked the then-current version of Rule 5(a) of the Federal Rules of Criminal Procedure, to require presentment before a judicial officer "without unnecessary delay," but that, in the course of development, it was modified. As adopted, it stated a two-part requirement:

"A defendant shall be taken before a conveniently available judicial officer without unnecessary delay and in no event later than the earlier of (1) twenty-four hours after arrest or (2) the first session of court after the defendant's arrest upon a warrant, or, where the arrest has been made without a warrant, the first session of court after the charging of the defendant. Such charging shall take place promptly after arrest."

With but minor style changes, that Rule was in place, as Maryland District Rule 723a., when *Johnson* was decided. Johnson was arrested at 3:15 p.m. in connection with the armed robbery of a supermarket. Upon his arrival at the

police station he was given *Miranda* warnings but, because he complained of stomach pains and exhibited a poor physical appearance, interrogation was postponed and he spent the night in a lockup cell. At 9:45 the next morning, following a written waiver of his rights, he was interrogated for about six hours, culminating in a ten-page written statement. The statement was signed at 3:45 p.m., following which, at about 4:00, he was taken before a District Court Commissioner. There clearly was a violation of the Rule—not only was the presentment outside the 24 hour limit but, we concluded, it was not without unnecessary delay. The evidence established, we said, that the police "deliberately postponed presentment of appellant for the purpose of subjecting him to further interrogation." *Id.* at 330, 384 A.2d at 718. The question was whether the violation served to make the confession inadmissible.

In that regard, the State made a number of arguments. First, it urged that the Rule was merely directory-"guidelines for the disposition of defendants upon arrest." *Id.* at 320, 384 A.2d at 713. We rejected that argument, in part because the Rule was cast in mandatory language, and as well because we viewed the requirement of prompt presentment before a neutral judicial officer as "a *sine qua non* in any scheme of civil liberties." *Id.* at 321, 384 A.2d at 713. Presentment, we said, serves four vital functions: the determination of whether sufficient probable cause exists for continued detention; determination of eligibility for pre-trial release; informing the accused of the charges against him, his right to counsel, and, if indigent, his right to appointed counsel; and, if the charge is beyond the jurisdiction of the District Court, his right to a preliminary hearing. *Id.* at 321–22, 384 A.2d at 713. It thus serves to implement a number of Federal and State Constitutional rights possessed by an accused-to be informed of the charges against him, to be free from unreasonable seizures of his person, to have the assistance of counsel, and to be free from coercive investigatory methods. Noting that only one State—Arkansas—had held a similar rule to be directory only,

we held that the Rule was mandatory. *Id.* at 322–23, 384 A.2d at 714.

We then considered the State's further argument that, even if the Rule was mandatory, we should not attach an exclusionary rule to it, as the Supreme Court had done with respect to the analogous Federal rule in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), but should instead adopt the approach then chosen by the majority of the States and apply a general voluntariness standard to statements obtained in violation of the Rule. *Id.* at 323–25, 384 A.2d at 714–15. Believing, as some other States did, that the general voluntariness standard was inadequate to safeguard the right of prompt presentment, we concluded that "the exclusionary rule is perhaps the most effective and practical means of curbing lawless police conduct when it impinges upon fundamental legal and constitutional rights of a criminal defendant." *Id.* at 326, 384 A.2d at 716. We pointed out that the exclusionary rule was particularly effective as a deterrent when applied to custodial interrogations, "since police activity at this stage in the investigation is likely to be aimed at procuring evidence for use at trial." *Id.*

Having proceeded to that point, we addressed two further arguments posited by the State—that we should limit any exclusionary rule and apply it only if (1) the defendant could demonstrate that he was "unfairly prejudiced" by the police conduct, or (2) the violation of the Rule was "substantial"—*i.e.,* gross, wilful, and prejudicial, or was of a kind likely to mislead the accused as to his legal rights or to have influenced his decision to make a statement, or created a significant risk of untrustworthiness. *Id.* at 327, 384 A.2d at 716–17. We rejected those offerings. The prejudice prong, we suggested, "would encumber the defendant with the well-nigh insurmountable burden of showing that detention was deliberately prolonged in order to extract a confession," and the alternative approach would "significantly and unnecessarily complicate and confuse admissibility determinations by requiring trial courts to apply criteria which are themselves not susceptible

of precise definition." *Id.* at 327–28, 384 A.2d at 717. Instead, we concluded that protection of the right of prompt presentment was best assured by a *per se* exclusionary rule and thus held that a statement "is automatically excludible if, at the time it was obtained from the defendant, he had not been produced before a commissioner for his initial appearance within the earlier of 24 hours after arrest or the first session of court following arrest, irrespective of the reason for delay." *Id.* at 329, 384 A.2d at 717.

With respect to delays within the 24–hour period, we said that it was incumbent on the trial court to determine whether the State had met its burden of showing that the delay was necessary under the circumstances, and, borrowing from *Mallory v. United States, supra,* and other sources, we gave examples of situations in which a delay *would* be regarded as necessary:

"(1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; (2) to determine whether a charging document should be issued accusing the arrestee of a crime; (3) to verify the commission of the crimes specified in the charging document; (4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; (5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may be associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime."

*Johnson, supra,* at 329, 384 A.2d at 717. We noted further that a truly spontaneous threshold statement uttered at or shortly after the time of arrest would not be excludible on the ground that the police subsequently failed to act diligently because, in that event, there would be no connection between the delay and the statement. *Id.* at 329, 384 A.2d at 718.

At the next (1979) session of the General Assembly, bills were introduced into both Houses to modify our ruling.

Aware that our Standing Committee on Rules of Practice and Procedure was considering amendments to Maryland District Rule 723a., however, the Senate killed both bills. In fact, the amendment being considered by the Rules Committee, which was ultimately adopted by us, did not have the effect of overturning our conclusion that the prompt presentment requirement of Maryland District Rule 723a. was mandatory and that it was to be enforced through a *per se* exclusionary rule. The concern was over the "first session of court" language, which the Rules Committee suggested might require the police to take the defendant immediately before a District Court judge if court was in session at the time of arrest and thus not permit any delay at all. As District Court Commissioners were available 24 hours a day, seven days a week, there was no need for the "first session of court" requirement. Its deletion would preserve the test of unnecessary delay and the 24–hour outside limit. *See* SIXTY-FOURTH REPORT OF THE STANDING COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, March 13, 1979. We adopted that change effective July 1, 1979, to make the Rule require that the defendant be taken before a judicial officer "without unnecessary delay and in no event later than 24 hours after arrest."

Notwithstanding that the amendment to the Rule did not serve to modify the effect of *Johnson*, no attempt at legislation was made in the 1980 session. In December, 1980, we decided *McClain v. State*, 288 Md. 456, 419 A.2d 369 (1980), in which, applying our ruling in *Johnson* retroactively, we reversed the first degree murder conviction of a defendant who had dropped a ten-month old child into the trash chute of a high-rise apartment building, because a confession obtained 24 hours and twelve minutes after his arrest, without prior presentment to a District Court Commissioner, was admitted.

That decision did produce a swift legislative response. At the strong urging of the law enforcement community, the Legislature, in its next session, enacted 1981 Maryland Laws, chapter 577 (Maryland Code, § 10–912 of the Courts and Judicial Proceedings Article), which, with a subsequent style amendment, provides that "[a] confession may not be excluded

from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules" and that "[f]ailure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession." There is no doubt that the statute was a delayed reaction to *Johnson* and an immediate reaction to *McClain*. See *Woods v. State,* 315 Md. 591, 614, 556 A.2d 236, 247 (1989).

### Violation of the Rule

For obvious reasons, the State makes no argument that there was compliance with the Rule in this case.[1] Petitioner clearly was not presented to a District Court Commissioner within 24 hours after his arrest. The State does assert that there was no unnecessary delay, however, and thus posits that there was no violation of that prong of the Rule. In making that argument, it looks to the fact that the police could not begin even a preliminary inquiry until 9:25 a.m., when they

---

1. The right, and duty, of prompt presentment appears in two different sections of Rule 4–212. Section (e) deals with the situation in which the defendant is arrested pursuant to a warrant and is not otherwise in custody and, among other things, provides that [t]he defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest or, if the warrant so specifies, before a judicial officer of the circuit court without unnecessary delay and in no event later than the next session of court after the date of arrest. Section (f) deals with the situation in which the defendant is either arrested without a warrant or is already in custody. It states that, when the defendant is arrested without a warrant, "the defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest." Although petitioner focuses his argument entirely on section (e), it would appear that section (f) is the more relevant section. He was arrested without a warrant and was interrogated pursuant to that arrest. Although a warrant for his arrest in the Sterling case may have been previously issued, there is no indication that it was served on him prior to his inculpatory statements or that anyone was proceeding under section (e). As the requirement of prompt presentment appears in both sections, however, his reliance on section (e) is of no significance.

brought petitioner from the hospital to the police station, and that he began confessing almost immediately. The trial court also found that significant.

■ The State's theory of an essentially seamless interrogation that produced five written and several oral statements, one after another, is not supported by the record. That argument has merit with respect to the statements regarding the two robberies, but not as to the statements concerning the three homicides. It is true that petitioner was not effectively available for questioning until he arrived at the police station at about 9:25 a.m. on July 30. It was entirely appropriate at that point for the police to engage in preliminary questioning, to get some basic information about their suspect and even about his involvement in the two robberies, so that he could be properly identified and charged.

That questioning began within ten minutes and promptly produced oral confessions to the two robberies. It was not then inappropriate for the police to seek a written statement, to confirm the oral admissions, which they also did promptly. The first written statement was begun at 10:35, within ten minutes after the interrogation began, and was completed by 11:13. Only then did Detective Thrift discover the likelihood that petitioner was not who he said he was—Allan Williams— but was, in fact, Reccardo Williams, someone, he learned, who was suspected in three homicides. Especially in light of petitioner's oral confession to the second robbery, some further questioning was not inappropriate. The second statement was begun at 11:40 and was completed by 12:42.

■ At that point, after just over three hours of interrogation, the police had all of the basic information they needed to present petitioner to a Commissioner. They knew who he was and had solid grounds upon which to charge him with two armed robberies. They could have taken him to a Commissioner and then returned him to the station for questioning as to the homicides.[2] Instead, at 1:13 p.m., he was turned over to

---

2. Even if, in the unlikely event that the Commissioner had ordered petitioner released, with or without bail, there was an arrest warrant

the homicide unit for interrogation as to a wholly different set of crimes. That interrogation was for none of the appropriate purposes that we noted in *Johnson*. There were no apparent administrative functions to be performed that required further questioning, and, to the extent there were any, it does not appear that the ensuing questioning was for that purpose. The homicides had been committed on July 21—nine days earlier. Petitioner had already been charged in at least one of them. There was no concern about possible harm to other people or property, and it does not appear that the police were focusing on the identity or location of other persons. Petitioner was not questioned about an accomplice until sometime after 10:21 a.m. on July 31, some 21 hours after the homicide interrogations began.

The sole, unadulterated purpose of the subsequent interrogation was to obtain incriminating statements, and that, nearly all courts agree, is not a proper basis upon which to delay presentment. *See Young v. State*, 68 Md.App. 121, 134, 510 A.2d 599, 606 (1986) (quoting *Meyer v. State*, 43 Md.App. 427, 434, 406 A.2d 427, 433 (1979)) (Rule "does not countenance a delay for the principal purpose of obtaining a statement or confession from the defendant"); *Mallory, supra*, 354 U.S. at 455, 77 S.Ct. at 1360, 1 L.Ed.2d at 1483 (delay must not be of such a nature as to give opportunity for extraction of confession); *United States v. Perez*, 733 F.2d 1026, 1036 (2d Cir. 1984) (delay for sole purpose of interrogation is unreasonable); *United States v. Wilson*, 838 F.2d 1081, 1087 (9th Cir.1988) (delay unreasonable where it was deliberate and for purpose of obtaining confession).

The entire delay from and after 1:13 p.m. on July 30 was unnecessary and thus constituted an independent violation of Rule 4–212. Both violations, moreover, were deliberate. This was not a case of the violation being inadvertent, or unpreventable, or even negligent rather than purposeful. There is

---

outstanding with respect to the Sterling homicide, and petitioner could have been taken into custody on that warrant and returned for appropriate questioning.

no suggestion in this record that a Commissioner was not immediately available or that petitioner could not have been transported to the Commissioner and returned to the station without any inordinate delay.

### Harmonizing the Rule and the Statute

■ Although the Rule and the statute have different origins, in different Branches of the government, they relate to the same issue or circumstance, and thus, both as a matter of comity between the Branches and in conformance with the general rule governing laws that relate to the same thing, they should, if possible, be read in harmony rather than as contradictory, so that proper effect can be given to both. *See Mid–Atlantic Power Supply Ass'n v. PSC,* 361 Md. 196, 203–04, 760 A.2d 1087, 1091 (2000); *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000).

Maryland is not alone in having to mesh a prompt presentment rule, established either by case law or by an actual rule of procedure, with a statute that makes the admissibility of a confession hinge on voluntariness rather than just on a violation of the rule. That situation exists as well in the Federal system and in many States, and we may look to them for some guidance.

As we noted, beginning in 1943 with *McNabb v. United States, supra,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 and confirmed by *Upshaw v. United States,* 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948) and *Mallory v. United States, supra,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, the Supreme Court held that, in Federal prosecutions, a confession obtained in violation of the prompt presentment requirement of what in *McNabb* were statutes and what, by the time of *Mallory,* had become Federal Rule of Criminal Procedure 5(a), was *per se* inadmissible, even if otherwise voluntary.

In 1968, Congress sought to limit the effect of those decisions through the enactment of 18 U.S.C. § 3501, which was part of the Omnibus Crime Control and Safe Streets Act of 1968. Subsection (a) states the general rule that, in any

Federal prosecution, a confession is admissible in evidence *if it is voluntarily given*.[3] Subsection (b) requires the court, in determining voluntariness, to consider a number of factors, among which is the time elapsing between arrest and arraignment, but states that the presence or absence of any of the enumerated factors "need not be conclusive" on the issue of voluntariness. Subsection (c) is the part that interacts most directly with Rule 5(a). In relevant part, it provides that a confession made while the defendant was in custody is not inadmissible solely because of delay in bringing the person before a magistrate if (1) the confession is found by the judge to be voluntary, (2) the weight to be given to the confession is left to the jury, and (3) the confession was made within six hours immediately following the defendant's arrest or other detention. There is then a *proviso:* that the six hour time limitation does not apply in any case in which the delay beyond the six-hour period is found by the judge to be reasonable, "considering the means of transportation and the distance to be traveled to the nearest available [magistrate]."

In part because of the way it is drafted, the statute has produced a myriad of issues discussed in hundreds of cases, as well as some doctrinal splits in the Federal system. Most courts treat the six-hour window as a kind of safe harbor, provided the confession is otherwise voluntary. Much of the debate is over the effect to be given to confessions made after the expiration of the six-hour period where (1) it was possible to have taken the defendant before a magistrate prior to the making of the confession, and (2) the delay beyond the six hours was deliberate and for the purpose of interrogation to extract a confession. That, of course, is essentially the issue before us.

---

3. In *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the Supreme Court held that § 3501(a), making voluntariness the sole criterion, did not serve to eliminate the exclusionary rule adopted in *Miranda*, which, the Court declared, was a Constitutional ruling. We see no reason why *Dickerson* would not apply in the same fashion to § 10–912.

In *United States v. Perez,* 733 F.2d 1026 (2d Cir.1984), the Court of Appeals for the Second Circuit took the view that, although § 3501 does not *require* suppression simply because of a delay beyond six hours, the statute *permits* suppression on that ground, independent of any general voluntariness question, unless the court finds that the delay was reasonable. It construed § 3501 as advancing two distinct bases for excluding a confession: "The first, as stated in subsection (a), is a lack of voluntariness. The second, according to subsection (c), is delay of greater than six hours found not to be reasonable." *Id.* at 1031. It regarded the statute as overruling *McNabb–Mallory* only to the extent of unreasonable delays of less than six hours and reasonable delays of greater than six hours. *Id.* at 1035. *See also United States v. Khan,* 625 F.Supp. 868 (S.D.N.Y.1986) and *United States v. Rivera,* 750 F.Supp. 614 (S.D.N.Y.1990), following the Second Circuit precedent.

The Second Circuit seems to stand alone in that view. The other Federal courts have concluded that a delay in presentment, beyond the-six hour window, is merely a factor to be considered in determining whether a resulting confession was voluntary and will not, by itself, warrant exclusion. *See* Timothy M. Hall, Annotation, *Construction and Application of Provision of Omnibus Crime Control and Safe Streets Act of 1968, as Amended (§ 18 U.S.C.A. 3501(c)), that Defendant's Confession Shall Not Be Inadmissible in Evidence in Federal Criminal Prosecution Solely Because of Delay in Presentment before Magistrate,* 124 A.L.R. Fed. 263 (1995, updated January, 2000), § 5. Several of those courts have, however, given special weight to that factor when the delay exceeds six hours and is found (1) to be unreasonable, *i.e.,* not resulting from any inability to have timely presented the defendant before a magistrate, and (2) to have been for the purpose of extracting a confession. In *United States v. Wilson,* 838 F.2d 1081, 1086 (9th Cir.1988), the court noted that "[t]he fact that unreasonable delay, alone, beyond six hours may support a finding of involuntariness suggests that unreasonable delay is the most important factor of all," and, largely on that basis,

held that a delay that was "deliberate and for the sole purpose of obtaining a confession" (*id.* at 1085) served to make the confession involuntary.

Even in cases in which confessions obtained more than six hours after arrest have been held admissible, courts have stressed that the delay was *not* for the purpose of coercion. *See United States v. Bustamante–Saenz*, 894 F.2d 114 (5th Cir.1990) (nothing in the record suggests that presentment was delayed for purpose of interrogation or other malevolent reason); *United States v. Christopher*, 956 F.2d 536 (6th Cir.1991), *cert. denied*, 505 U.S. 1207, 112 S.Ct. 2999, 120 L.Ed.2d 875 (court must be alert to possibility that delay used for purpose of conducting improperly coercive interrogation).

The States have taken a variety of different views. Some, as this Court did in *Johnson*, have adopted the *McNabb–Mallory* view that any unnecessary or unlawful delay in presentment will cause a confession obtained during that period of delay to be inadmissible, regardless of voluntariness. Most of those cases are twenty or more years old. *See* Romuldo P. Eclavea, Annotation, *Admissibility of Confession or Other Statement Made by Defendant as Affected by Delay in Arraignment—Modern State Cases*, 28 A.L.R.4th 1121 (1984, updated February, 2003), § 3. Others hold that unnecessary delay alone will not vitiate the confession unless the delay was prejudicial to the defendant or resulted in the denial of some Constitutional right. *See id.*, § 4. Still others hold that delay does not render the confession inadmissible unless the delay induced, caused, or was used to extract the confession. *See id.*, § 5; *Clay v. State*, 318 Ark. 122, 883 S.W.2d 822 (1994); *People v. Stinson*, 113 Mich.App. 719, 318 N.W.2d 513 (1982); and *cf. Coleman v. State*, 592 So.2d 517 (Miss.1991). The majority hold that delay, even unnecessary delay, is simply a factor to be considered in determining voluntariness, which is the critical criterion for admissibility. *See id.*, § 6.

As we observed, § 10–912 was a reaction to *Johnson* and *McClain*, both of which applied a *per se* rule of exclusion for confessions taken more than 24 hours after arrest, without

regard to the reason for the delay. The statute did not attempt to modify the substantive requirement of the Rule, that defendants be presented without unnecessary delay and, in any event, within 24 hours. Nor did it seek to change our conclusion that the Rule was mandatory and not merely directory. The goal of the statute was simply to eliminate a Rule violation as an independent ground, separate from voluntariness, for rendering a confession inadmissible. The Legislature obviously recognized the important purpose of a prompt presentment requirement, however, for it called special attention to a violation of that requirement as a factor to be considered in determining voluntariness. No other factor bearing on voluntariness was specifically mentioned; nor did the Legislature attempt to prescribe the weight to be given to it.

Many factors can bear on the voluntariness of a confession. As noted in *Winder v. State*, 362 Md. 275, 307, 765 A.2d 97, 114 (2001), we look to all elements of the interrogation, including the manner in which it was conducted, the number of officers present, and the age, education, and experience of the defendant. Not all of the multitude of factors that may bear on voluntariness are necessarily of equal weight, however. Some are transcendent and decisive. We have made clear, for example, that a confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, notwithstanding any other factors that may suggest voluntariness, unless the State can establish that such threats or promises in no way induced the confession. *See Winder, supra; see also Hillard v. State*, 286 Md. 145, 406 A.2d 415 (1979). A confession that is preceded or accompanied by any physical mistreatment would obviously be regarded in the same way. Those kinds of factors are coercive as a matter of law. When shown to be present, the State has a very heavy burden, indeed, of proving that they did not induce the confession.

Other factors, such as the length of interrogation, team or sequential questioning, the age, education, experience, or

physical or mental attributes of the defendant, do not have that broad, decisive kind of quality but assume significance, and may become decisive, only in the context of a particular case—based on the actual extent of their coercive effect. Lying between these two kinds of factors is a third—factors that may not be coercive as a matter of law but that need to be given special weight whenever they exist. Among them is the deliberate and unnecessary violation of an accused's right to prompt presentment—a right designed to provide the defendant with a clear explanation of more basic Constitutional and statutory rights. The reason that kind of violation must be given special weight in determining voluntariness is that, when the right it is designed to protect is transgressed, there may be no practical way of calculating the actual effect of the transgression.

In *Johnson*, we noted in a general way the four functions served by presentment before a District Court Commissioner. Maryland Rule 4–213, various statutes, and the procedures set forth in the District Court Commissioner's Manual provide important supplementing detail. The Commissioner must explain not only each charge facing the defendant but also the allowable penalties, including any mandatory penalties. That information may not have been supplied to the defendant by the police prior to interrogation—it is not part of the standard *Miranda* advice—and it can be important.

The pre-trial release determination is also significant. Subject to certain exceptions specified in Maryland Code, §§ 5–101 and 5–202 of the Criminal Procedure Article and Maryland Rule 4–216, a defendant is entitled to be released on personal recognizance or on the least onerous conditions that will reasonably assure his or her appearance or the safety of any victim and the community. If the defendant is able to obtain release, he or she may be unwilling to undergo further interrogation. Although, in light of the warrant charging petitioner with murder, release was not a likely prospect for him, it is for most defendants.

When these protections are not afforded, the effect of their denial may be difficult, at best, to determine. That is evident here. Although petitioner quickly and freely confessed to two robberies, it is not at all clear that, had he been presented timely to a Commissioner, he would have acquiesced in the later interrogations and confessed to three murders.

The interrogations regarding the robberies commenced almost immediately and very quickly produced two oral confessions. The first written statement came within an hour, and a second was begun within two hours. There were no discernible "coercive barnacles" associated with them. That is not so with respect to the later interrogations. The continuing time lapse, the sequential interrogations by different detectives, the 19–year–old petitioner remaining in the same tiny windowless room for an additional six-and-a-half hours before commencing the first statement regarding the Sterling murder and another two hours before starting the statement concerning the Cook/Pelt murders, clad only in a hospital gown, certainly exacerbates the mere fact of delay. The trial court stressed petitioner's willingness to continue confessing, but one may only speculate whether that willingness to confess to three murders was induced by his continued detention. Even a defendant who has been subjected to threats, promises, or physical mistreatment may thereafter appear eager to inculpate himself. It seems clear that petitioner was not enthused about writing a statement regarding the Sterling murder, for he delayed doing so for an hour, until prodded by Detective Nelson.

The statements made thereafter were even more suspect. After a full day and evening of sequential interrogation, the latter eleven hours of which was in a Spartan eight foot by eight foot room, petitioner was left alone in that room overnight, to sleep on the floor, only to be questioned again early the next morning by Detective Burns. There was utterly no reason why petitioner was left in that condition, why he could not have been taken before a Commissioner and properly housed for the evening. On this record, we regard that as physically coercive mistreatment, which might well make the

ensuing statements to Detective Burns and Nelson independently involuntary, quite apart from the delay itself.

There is, we think, a fair and practical way to harmonize the Rule and the statute—to allow the police to make a sufficient preliminary investigation necessary to determine what charges, if any, should be brought against an accused, to complete any necessary administrative "booking" procedures, and to determine whether the accused is willing to undergo interrogation, and yet to make meaningful the important protections afforded by the Rule. Under current law, if the police intend to conduct a custodial interrogation, they must inform the accused of the various *Miranda* rights and obtain a waiver of the accused's right to remain silent and to consult first with an attorney. The police ordinarily, as a matter of accepted practice, obtain a written waiver of those rights. That helps to establish that any statement made thereafter is voluntary, but it obviously does not establish voluntariness on its own.

The same approach can easily and effectively be used with respect to the right to prompt presentment for an accused detained pursuant to an arrest. It would be a simple matter for the police to advise the accused as well of his or her right to prompt presentment before a District Court Commissioner, that the Commissioner is a judicial officer not connected with the police, and that the Commissioner, among other things, will inform the accused of each offense with which he or she is charged, including the allowable penalties attached to those charges, furnish the accused with a written copy of the charges, advise the accused of his or her right to counsel, make a pre-trial release determination, and if, as here, the accused has been charged with a felony beyond the jurisdiction of the District Court, of his or her right to a preliminary hearing before a judge. *See* Md. Rule 4-213. The police could inform the defendant that he or she may waive that right of prompt presentment and agree to submit to interrogation, subject to the right to end the interrogation at any time and demand to be taken promptly before a Commissioner. That kind of advice and a form for the written waiver can as

easily be standardized as the *Miranda* advice and waiver have been, and should not take more than a few minutes to accomplish.

■ We cannot, of course, direct the police to give this kind of advice or to obtain a special waiver, and we do not propose to do so. What we can do, however, is to make clear that, if this kind of advice is properly given and a proper waiver of the right to presentment in conformance with the Rule is obtained, subject to honoring any later request of the defendant to terminate the interrogation and be taken promptly before a Commissioner, the police could proceed with a reasonable interrogation without violating Rule 4–212(e) or (f) and thus avoid any conflict between the Rule and § 10–912.[4]

■ On the other hand, if the police eschew that approach, fail to obtain such a waiver, and, as here, deliberately delay presentment in order to conduct a custodial interrogation, any resulting confession must be regarded as laden with suspicion. The violation of the Rule in such a circumstance will have to be given very heavy weight, by both the suppression court and by the trier of fact, in determining the overall voluntariness of the confession. Obviously, the longer any unlawful delay, the greater is the weight that must be given to the prospect of coercion.

### Conclusion

We are not establishing a new rule or any mandated procedure, but simply divining a practical way to harmonize Rule 4–212 and § 10–912 and articulate a standard for how to assess a deliberate violation of the Rule in determining the voluntariness of a confession. The Rule has been in effect since 1971; its basic requirement of prompt presentment has been part of the law since much more ancient times. It is not a new hurdle

---

4. The delay in presentment, even with a waiver, must be reasonable. The Rule already sets 24 hours as an outside limit for presentment, and, absent some truly extraordinary circumstance, we would not expect any delay incurred for purposes of interrogation to extend beyond that period.

for the police, and it certainly is not an onerous one. We acknowledge that confessions are "essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *See Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 1143, 89 L.Ed.2d 410, 424 (1986), quoted by us in *Winder v. State,* 362 Md. 275, 304–05, 765 A.2d 97, 113 (2001). That is true, however, but only if the confession is indeed, voluntary. Confessions extracted through coercion have no place in our system of administering justice. The notion that a confession obtained in deliberate violation of Rule 4–212(e) or (f) is under a cloud of suspicion contravenes neither logic nor practical human experience. The police have always been free either to comply with the Rule or to obtain a waiver from the accused.

We hold that any deliberate and unnecessary delay in presenting an accused before a District Court Commissioner, in violation of Rule 4–212(e) or (f) must be given very heavy weight in determining whether a resulting confession is voluntary, because that violation creates its own aura of suspicion. The violation does not, of itself, make the confession involuntary or inadmissible. It remains a factor to be considered, along with any others that may be relevant, but it must be given very heavy weight. There was such a violation here, and we are convinced from the record that the trial court did not give that violation the proper weight and did not instruct the jury to do so. It is for those reasons that we reverse.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND REMAND THE CASE TO THAT COURT FOR NEW TRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PRINCE GEORGE'S COUNTY.