913 A.2d 617

Sonya Marie DANIELS

v.

STATE of Maryland.

No. 223, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Dec. 26, 2006.

76

78

Stacy W. McCormack (Nancy S. Forster, Public Defender, on brief), for appellant.

Jeremy M. McCoy (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel DAVIS, SALMON and RAYMOND G. THIEME, Jr. (retired, specially assigned), JJ.

DAVIS, J.

Appellant, Sonya Marie Daniels, was charged in the Circuit Court for Frederick County with two counts of first-degree murder, attempted kidnapping and carrying a handgun. Appellant, facing the death penalty, requested a change of venue and the case was transferred to the Circuit Court for Montgomery County. On October 21, 2003, jury selection began and, after trial, the Circuit Court for Montgomery County, on

November 19, 2003, declared a mistrial after the jurors were unable to reach a verdict.

On October 18, 2004, appellant's second trial began. The State, however, decided not to seek the death penalty and, on November 8, 2004, appellant elected to proceed by way of a not guilty agreed statement of facts on two counts of first-degree murder. Based on the statement of facts, the trial court entered a finding of guilty as to both counts. On February 3, 2005, appellant was sentenced to a term of life imprisonment without the possibility of parole for each count of first-degree murder, the sentences to run concurrent. Appellant filed this timely appeal, presenting the following questions for our review:

I. Did the trial court err in denying appellant's motion to suppress evidence seized during a search of appellant's van?

II. Did the trial court err in denying appellant's motion to suppress statements made by appellant to deputies from the Frederick County Sheriff's Department prior to her presentment before the magistrate?

For the reasons that follow, we affirm the judgments of the circuit court.

## FACTUAL BACKGROUND

On October 19, 2002, a dark green mini-van drove onto Discovery Boulevard and pulled in front of the house of Deanne Prichard. Nine-year-old Lee Prichard, Jr. was out front when the van pulled up. Lee, his mother, Patricia Collins, his sister, sixteen-year-old Deanne Prichard, and his five week old niece, Makayla, had just returned home from visiting Tracy Frost, his sister's boyfriend, at the Washington County Detention Center. The driver of the van, an African American female with marks on her face, rolled down her window and told Lee that she was "Tracy Frost [sic] sister from New York" and that she wanted to see the baby. Lee then went inside to get his sister.

As Collins walked outside with her daughter, granddaughter and son, the assailant, in a black ski mask and hood, jumped out of the van holding a black handgun. The assailant demanded that Prichard get into the van, but she refused as she was holding her baby. The assailant pointed the gun at Prichard and fired. After she and the baby fell to the pavement, the assailant pointed the gun at the baby and fired a second shot. The assailant jumped back in the van and drove off.

The Frederick County Sheriff's Office responded and arrived on the scene immediately after the shooting, finding Prichard and baby Makayla lying on the street. Both were pronounced dead at the scene. The police spoke with several individuals at the scene and all gave varying descriptions of the assailant and the van. In an effort to find possible suspects, the police went to the Washington County Detention Center to speak with, Makayla's father, Tracy Frost. During their conversation with Frost, police learned that there had been an altercation at the prison two weeks earlier between appellant, who was Frost's ex-girlfriend and Prichard. Frost informed the police that, on October 5, 2002, appellant was visiting him during the same time that Prichard, Makayla and Collins were visiting. Following a confrontation between Prichard and appellant, appellant was asked to leave.

Based on information gathered from the scene and at the detention center, the Frederick County police turned their attention to appellant as a suspect. Detectives Dewees and Jenkins drove to the Martinsburg, West Virginia Police Department and requested assistance. Detective Dewees informed Martinsburg police that appellant was a suspect in a double homicide investigation and that they were trying to locate a green mini-van that was registered to appellant's father. Detective Dewees then provided the officers with appellant's address and license plate number of the van and instructed the Martinsburg police to conduct a stop of the vehicle.

On October 19, 2002, at approximately 9:25 p.m., Martinsburg police officers stopped appellant while driving the green mini-van four blocks from her home. After stopping the vehicle, the officers ordered appellant out of the mini-van. She was told that she was free to leave, but that the van was being detained. When appellant was further told that officers from the Frederick County Sheriff's Department were en route to Martinsburg, she agreed to stay until they arrived.

While waiting for the officers from Frederick County, Martinsburg police set up a perimeter around the van and blocked off the area with police tape. Using flashlights to facilitate an inspection of the vehicle, the officers noticed several dark stains on one of the rear hubcaps. In an effort to preserve possible evidence on the vehicle from rain which had begun to fall, a tent was placed over the van. When the Frederic County police officers arrived two hours later, they were met by a Martinsburg's police officer who had remained at the scene with the van.

Appellant spoke with police officers briefly, then left the scene with her sister. Her father, the owner of the van, remained with the vehicle. A warrant to search the van was obtained by Martinsburg police at 1:00 a.m., approximately two hours later. While the search of the van was being conducted, Martinsburg police, accompanied by a Frederick County officer, went to appellant's home and executed the fugitive warrant they had obtained for her arrest. She was then taken to the Martinsburg Police Department where she was processed and placed in a room where she was interviewed by Detectives Dewees and Jenkins, beginning at 1:48 a.m.

At approximately 4:00 a.m., appellant complained of chest pains and was taken to the hospital, where she was treated and released the next morning. At approximately 10:05 a.m. the next day, appellant was taken before a magistrate. At approximately 3:15 p.m., she was again interviewed by Deputies Dewees and Jenkins. Appellant was then returned to

Maryland, where she faced charges of two counts of first-degree murder and related offenses in Frederick County.

After the State filed its notice to seek the death penalty, appellant filed for a change of venue, prior to trial. On September 29, 2003, a hearing on pre-trial motions was conducted in the Circuit Court for Montgomery County. Appellant's initial trial commenced on October 29, 2003. On November 19, 2003, a mistrial was declared after the jury informed the court that it was unable to reach a verdict. Prior to the second trial, the State withdrew its notice to seek the death penalty, seeking instead a maximum penalty of life imprisonment without the possibility of parole. On June 30, 2004 and September 2, 2004, additional hearings on pre-trial motions were held.

After jury selection, appellant's retrial commenced on October 25, 2004. On November 3, 2004, six days into the trial, the State disclosed that it intended to call Joe Daniels, Jr., appellant's brother, as a witness on behalf of the State. He had been an alibi witness for the defense in the first trial and it was anticipated that he would again provide an alibi in the second trial. According to the State's proffer, Daniels was prepared to implicate appellant in the murders. Appellant's defense counsel moved for a mistrial, specifically conditioned on preclusion of the State from seeking the death penalty at a subsequent trial. In the alternative, defense counsel moved to continue the trial for two weeks. The trial court took the matter under advisement and continued the case for several days. On November 8, 2004, trial resumed; defense counsel renewed her motion for a mistrial with the same condition regarding seeking exposure to the death penalty at a subsequent trial. The trial court denied the motion. Defense counsel, faced with what she considered a Hobson's choice, proffered that the defense and the State were negotiating aborting the trial and entering an agreed statement of facts with respect to the two counts of murder, coupled with the State's agreement to nolle pros each of the remaining counts in the indictment.

Appellant, responding to the examination by the court as to whether she concurred with the proposed agreement between her counsel and the State, indicated that she wanted to abort the trial and proceed by way of a not guilty agreed statement of facts. Appellant then entered a plea of not guilty to the counts charging the first-degree murders of Deanne Prichard and Makayla Frost and the State presented the following agreed statements of facts to the trial court.

At approximately 3:00 p.m. on October 19th of 2002, members of the Frederick County Sheriff's Office, responded to Discovery Boulevard in Walkersville, Frederick County, Maryland. The bodies of 16–year–old Deanne Prichard and 5–week–old Makayla Frost were lying on Discovery Boulevard. Both were pronounced dead from single gunshot wounds.

Witnesses at the scene, including Maria Beyer, Leda Harris, Robert Crouse and Scott Shaffer would testify that they observed a dark green mini van, pulling away from the scene of the shooting. Robert Crouse would further testify that he saw an African American female with freckles on her face, driving the van. Leda Harris would further testify that the green mini van had Maryland tags.

Patricia Collins, the mother of Deanne and the grandmother of Makayla would testify that they had returned from Washington County Detention Center from visiting Tracy Frost, the father of Makayla Frost.

Lee Prichard, Jr., age 9, was outside his house on Discovery Boulevard when a dark green mini van pulled up. He would testify that an African American female with marks on her face, like chicken pox scars, stated, "I am Tracy Frost's sister from New York. I want to see the baby."

He goes in his house, walks out to the green mini van with Pat Collins, Deanne and Makayla. They then walk around to the driver's side of the van, at which time, the driver exits the van, with a black handgun with brown grips and a long barrel in hand. The person was wearing a ski mask and black leather gloves. The person told Deanne to get in the van. Deanne, while holding the baby refused, at

which time, the driver of the green mini van pointed the gun at Deanne and fired. The baby and Deanne fell to the street. The driver of the green mini van then pointed the gun at the baby, Makayla, and a second shot was fired at the baby by the driver.

Pat Collins would also testify that she walked out with Lee, Deanne and Makayla and approached the dark green mini van at the driver's side. The green mini van had Maryland tags and tinted windows. At the time she approached the driver's side door, a person exited who she would describe as an African American with a hoodie and a black ski mask. She would further describe the person as having the body shape and voice of a female, with a height about the same as Deanne, who was five foot four inches tall. No taller. The person had a black handgun, with brown grips, and was standing on the driver's side at [the] rear of the van. At this time, the person tells Deanne to get in the van, who refuses. The gun was then pointed by the driver of the green mini van, at the neck of Deanne and fired. Deanne falls to the ground while the baby was lying in the street. A second shot was fired by the driver of the green mini van at the face of the baby. Pat Collins only saw one person in the van.

The general physical descriptors given by the witnesses are consistent with the appearance of the defendant, [appellant]. Dr. Mary Ripple, who is the Deputy Chief Medical Examiner, would opine that Deanne's death was caused by a single gunshot wound to the neck, which round went through her cervical spine and exited the other side of her neck. She would state that death was very quick and that the gun was fired within six inches of her neck. Her opinion as to Makayla was that she was prone on the street when shot through the mouth, and the back of the head, causing death. The shot was fired within two feet of Makayla.

Tracy Frost would state, would testify that he and the [appellant] were in a romantic relationship for a period of about two years and that relationship ended in the Fall of 2001. Further, he would testify that he and Deanne Prich-

ard began a romantic relationship in the Fall of 2001. As a result of that relationship, Deanne became pregnant and gave birth to Makayla Frost on September 13th, 2002[sic]. He would further testify that he was incarcerated at the Washington County Detention Center on August 28th of 2002. The [appellant] visited him on four occasions. On October 5th of 2002, the [appellant] visited him at the same time that Deanne Prichard was visiting with Makayla Frost and Pat Collins. A confrontation occurred between Deanne and the [appellant], which precipitated Tracy Frost's request to have the [appellant's] visit terminated.

Deputy Bradley would testify that he, in fact, requested the [appellant] terminate the visit and leave and she did leave as a result of his request.

Pat Collins would state during the confrontation, the [appellant] states that the baby was not Tracy Frost's. At which time, Deanne states that the baby is Tracy's and that she would get a blood test.

Karlos Smallwood was a co-worker of the [appellant] when she was working at MAMSI. He would testify that [appellant] called him at some time prior to the murders and asked him where she could get a gun for protection.

Joe Daniels, Jr. is the brother of the [appellant]. He would testify that approximately two weeks prior to the murders, [appellant] asked him if he could get a gun for her. He did get a gun for the [appellant]. The gun was a black Smith & Wesson, 44 caliber magnum revolver with brown wooden grips. He would further testify that on 10/19 of 2002, at approximately 3:50 p.m. he was at home when the [appellant] arrived at his house. She stated to him that, "I think I just shot two people." At that time, she handed him a black jacket with clothes and a 44 caliber magnum revolver and asked him to get rid of the items. The black jacket had on it what appeared to him to be blood.

The following day, Joe Daniels, Jr. took the items to Arthur Lancaster's house in Frederick, Maryland. At Mr. Lancaster's house, Joe Daniels, Jr. proceeded to burn the items of clothing in a fire pit. He also buried the weapon.

Arthur Lancaster would corroborate that items of clothing were burned and a 44 caliber magnum revolver was buried by Joe Daniels, Jr. on his property.

Several months later, Joe Daniels, Jr. returned to Mr. Lancaster's property and unburied the weapon. He took it to a work site in Martinsburg, West Virginia and buried it in gravel. Subsequently, concrete was poured over the weapon. On or about November 3rd of 2004, members of the Frederick County Sheriff's Office responded to the location provided by Mr. Daniels and recovered the weapon from under the concrete walk.

On October 19th of 2002, the [appellant] was stopped in Martinsburg, West Virginia, while driving her father's green mini van, which van was borrowed by her prior to the shooting. The van had Maryland plates. Members of the Martinsburg Police Department made the felony stop and secured the vehicle.

Lt. Timothy Catlett would testify that on the driver's side rear hub cap, there appeared to be blood drops. Members of the Frederick County Sheriff's Office responded to the location and secured the hub cap as evidence.

The [appellant] was subsequently arrested and interviewed by members of the Frederick County Sheriff's Office on two occasions. On both occasions, the [appellant] indicated that she was in sole possession of the green mini van at the time of the murders.

The hub cap was transported to the Maryland State Police Crime Lab. Teresa Roberts, a certified serologist examined the hub cap. She would testify the areas had an appearance consistent with dried blood. She would opine that her testing showed four areas tested positive for the indication of blood.

She forwarded her results and the hub cap to the DNA section of the Maryland State Police Crime Lab. Amy Kelly, a certified forensic chemist, would testify that she performed a DNA analysis of swabbing from the areas of the hub cap where blood was indicated. From swabbing Q-1, she would opine that the DNA profile from the known

standard of Deanne Prichard matched the DNA profile obtained from swab Q–1 from the hub cap of the [appellant's] vehicle. Further, that the probabilities of selecting an unrelated individual at random would be one in 1.1 billion. From swabbing Q–2, she would opine that the DNA profile from the known standard of Deanne Prichard matched the DNA profile obtained from swab Q–2 from the hub cap of the [appellant's] vehicle. Further, that the probabilities of selecting an unrelated individual at random would be one in 42 million.

At the conclusion of the State's proffer, the trial court found appellant guilty of two counts of first-degree murder. Additional facts will be supplied during discussion.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress evidence under the Fourth Amendment, we look only to the record of the suppression hearing and do not consider any evidence adduced at trial. *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999). We extend great deference to the findings of the hearing court with respect to first-level findings of fact and the credibility of witnesses unless it is shown that the court's findings are clearly erroneous. *Reynolds v. State*, 130 Md.App. 304, 313, 746 A.2d 422 (1999), *cert. denied*, 358 Md. 383, 749 A.2d 173 (2000), *cert. denied*, 531 U.S. 874, 121 S.Ct. 178, 148 L.Ed.2d 122 (2000). Moreover, we view those findings of fact, and indeed the record as a whole, in the light most favorable to the State. *Id.* We review the court's legal conclusions *de novo*, however, making our own independent constitutional evaluation as to whether the officers' encounter with appellant was lawful. *Id.*

## LEGAL ANALYSIS

### I

### A.

Appellant contends that "the van was 'seized' at the moment the appellant was stopped and ordered out of the car by the

Martinsburg police and that the officers who conducted that seizure did so without probable cause." She argues that such a seizure requires probable cause, but, "If the seizure was somehow justified, the evidence obtained during the execution of the search warrant should have been suppressed because the Maryland officers who executed the warrant had no authority to do so." Appellant further contends that there was unnecessary delay in appellant's presentment before a magistrate. She summarizes her first assignment of error in her brief:

> Initially, it must be noted that the trial court applied [the] wrong standard when determining whether the seizure of the appellant's van was justified. After making several "findings," not all of which are supported by the record, the trial court stated that the Martinsburg officers *"had a substantial amount of information which would cause them to believe that they that [sic] van might yield some information if they could get a closer look at it."* (Emphasis supplied). There is no such test under the Fourth Amendment. The mere fact that a law enforcement officer may have a substantial amount of information which would cause him to believe that a search of property might yield some information does not justify a seizure under the Fourth Amendment. While that standard may be close in nature to a reasonable suspicion standard it is certainly a far cry from probable cause, and probable cause is what is required to justify the seizure in this case. The officer's [sic] in this case unquestionably "seized" the appellant's van for purposes of the Fourth Amendment. They made it absolutely clear to the appellant the minute they got her out of the car that the van was not leaving. Such a seizure requires probable cause.

The State counters that "the record clearly demonstrates that the police had adequate probable cause to lawfully conduct a warrantless stop and search of the vehicle at issue, regardless of the fact that a warrant was ultimately obtained in this case." The State further avers, "The officers' subjective intent in stopping the vehicle to detain it for the purposes

of obtaining a warrant is irrelevant for purposes of the Fourth Amendment analysis." The trial court properly denied appellant's motion to suppress, according to the State, because the investigating officers had probable cause that appellant and her vehicle were involved in the double shooting earlier that day, based on information from the officers' investigations. Finally, the State asserts that the fact that Frederick County law enforcement officers acted in concert with the Martinsburg Police Department during the execution of the search warrant for the vehicle was lawful.

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. . . ." *Rosenberg v. State,* 129 Md.App. 221, 239, 741 A.2d 533 (1999). The Supreme Court has frequently remarked that probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such belief be correct or more likely true than false. A "practical, non-technical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); *Riddick v. State,* 319 Md. 180, 194–95, 571 A.2d 1239 (1990).

The law is well established that a vehicle stop by the police and "detaining its occupants constitutes a 'seizure' within the meaning of the Fourth and Fourteenth Amendments to the federal Constitution, even though the purpose of the stop is limited and the resulting detention is quite brief." *Gadson v. State,* 341 Md. 1, 9, 668 A.2d 22 (1995), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996) (citations omitted). It is the reasonableness, *vel non,* by which we measure a state-initiated search and seizure to determine whether it passes constitutional muster. *See Florida v. Jime-*

*no,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990); *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985).

Regarding whether the standard which serves to lawfully justify the stop of a vehicle, in the first instance, should be objective or subjective, the Supreme Court, in *Whren v. United States,* 517 U.S. 806, 818–19, 116 S.Ct. 1769, 1777, 135 L.Ed.2d 89 (1996), rejected Petitioner's claim that an extraordinary factor was "that the 'multitude of applicable traffic and equipment regulations' is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop." The Court concluded that, since the officers had probable cause to believe that petitioners had violated the traffic code, the stop was thereby rendered reasonable under the Fourth Amendment and the evidence discovered as a consequence thereof was admissible. *Id.* The decision of the Court of Appeals for the District of Columbia Circuit, upholding the convictions, was therefore deemed correct. *Id.*

Turning to the issue of the search, recognizing that certain exigencies were inherent in the mobility of a vehicle, the Supreme Court, in *Carroll,* 267 U.S. at 155–56, 45 S.Ct. 280, held that the search of a vehicle, if there was probable cause to believe that it contained contraband, was an exception to the warrant requirement. *Accord Nathan v. State,* 370 Md. 648, 665–66, 805 A.2d 1086 (2002).

█ In reviewing the particular factors to be considered in a determination of whether a warrantless search of a vehicle comports with the "reasonableness" requirements of the Fourth Amendment, we said in *State v. Cabral,* 159 Md.App. 354, 372–73, 859 A.2d 285 (2004):

A warrantless search of a vehicle is permitted if there is probable cause to believe that the vehicle contains contraband. In general, the automobile exception to the warrant requirement is premised upon the exigencies associated with

the mobility of a vehicle, and the diminished expectation of privacy with regard to a vehicle.

\*     \*     \*

One of the core protections of the Fourth Amendment is the warrant requirement. There is, however, a lesser expectation of privacy associated with automobiles and, because they are inherently mobile, a warrantless search of a vehicle is permitted under certain circumstances. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more." This exception was derived from *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and has since been referred to as the *"Carroll* doctrine."

\*     \*     \*

132 Md.App. at 261, 752 A.2d 620 (internal citations and footnote omitted).

Writing for this Court in *Berry v. State,* 155 Md.App. 144, 176, 843 A.2d 93, *cert. denied,* 381 Md. 674, 851 A.2d 594 (2004), Judge Barbera explained:

The United States Supreme Court, in a series of cases harkening back almost 80 years, has recognized an exception to the warrant requirement that allows the police, when they have probable cause to believe a vehicle contains contraband or evidence of a crime, to search the vehicle for that contraband or evidence of a crime and seize it, without a warrant. It is clear from these cases that "the automobile exception does not have a separate exigency requirement: *'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment ... permits police to search the vehicle without more.'* "

(Citations omitted).

The concept of probable cause has been described as "a reasonable ground for belief of guilt." *Brinegar,* 338 U.S. at 175, 69 S.Ct. at 1310, quoted with approval in *Carroll, supra.*

In dealing with probable cause, however, as the very name implies, we deal with probabilities. *Id.* These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

*Id.*

The Court in *Brinegar* further observed,

And this "means less than evidence which would justify condemnation" or conviction, as Marshall, C.J., said for the Court more than a century ago in *Locke v. United States,* 7 Cranch 339, 348, 3 L.Ed. 364 (1813). Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their (the officers") knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

*Id.* at 175–76, 69 S.Ct. at 1310–11.

▇▇▇ In a more recent decision, we said in *State v. James,* 87 Md.App. 39, 46, 589 A.2d 81 (1991):

While the standard for probable cause varies with each occurrence, the experience of a police officer is taken into account in determining whether the officer could reasonably believe that the automobile will contain contraband. *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir.) (*en banc* ), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). Thus, the Court in *United States v. Shaw,* 701 F.2d 367, 376, *rehearing denied,* 714 F.2d 544 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984), stated that probable cause includes the *"sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers."*

(Citations omitted).

In the case at hand, the evidence in support of the State's argument that the investigating officers possessed probable

cause centered around the testimony of Detective David Dewees of the Frederick County Sheriff's office. Upon responding to the scene of the crime, he, of course, immediately determined, from his own observations, that sixteen-year-old Deanne Prichard and a five-week-old infant, Makayla Frost, had been murdered. As a result of interviewing Patricia Collins, who was Prichard's mother and Makayla's grandmother, Detective Dewees learned that, upon the return from the Washington County Detention Center, Collins, the two victims, and Deanne Prichard's nine-year-old brother, Lee, the latter had walked the dog, later advising Deanne, when he returned from walking the dog, that a woman claiming to be Tracy Frost's cousin was outside and wanted to see the baby. When Deanne and Makayla went outside, a female wearing a black ski mask shot the two victims.

Detective Dewees received information from Deputy Rick Cook that Cook had additionally learned from Collins that the assailant was seen in a green minivan and had told Lee that she was Tracy Frost's sister from New York. When Collins and Deanne, who was holding the baby, approached the driver's side of the van, the masked assailant exited the van and, at gunpoint, told Deanne to get in the van and then, when she refused, to hand over the baby. After shooting Deanne in the left side of her neck, the woman then shot baby Makayla.

Deputy Gary Marriotti advised Detective Dewees that he had learned from the Washington County Detention Center that the name of appellant had appeared on the visitor log at the Center as a visitor to Tracy Frost, that there had been an altercation between appellant and Deanne Prichard at the detention center a week earlier and that Daniels had been escorted from the facility. Accompanied by Sergeant Troy Barrick, en route to the detention center to interview Tracy Frost, Detective Dewees had the police dispatcher run the name of appellant through the Motor Vehicle Administration computer to ascertain her address and whether a van was registered to her. Registered in the name of appellant's father, Joe Daniels, was a Chevrolet van.

Upon being notified by Detective Dewees of the murders of Deanne and Makayla, Frost informed the officer that Deanne and appellant had visited him on October 5th and that he had told appellant that Deanne and the baby were in his life now, and that he did not want appellant to visit him anymore. According to Frost, appellant told him, "You'll never see that baby again." Frost provided Detective Dewees with a description of appellant, *i.e.*, a dark skinned African–American female with acne scars or pock marks on her face. In response to an inquiry regarding whether appellant had access to weapons and a van, Frost told Detective Dewees that her father, an employee of the Department of Corrections, had weapons and that he also owned a green minivan.

After concluding their interview with Frost, Detective Dewees and Deputy Barrick, having previously obtained an address for appellant at 110 Georgetown Square in Martinsburg, West Virginia, drove to Martinsburg, where they met with officers of the Martinsburg Police Department at 5:45 p.m. on the same day of the murders. After sharing all of the information that he had gathered about the shootings with Detective Sergeant George Swortwood of the Martinsburg Police Department, Detective Dewees proceeded to type the narrative for an arrest warrant for appellant, using one of the computers at the Martinsburg police station. Informed that appellant might have a look-alike cousin from New York visiting her, Detective Dewees and Detective Eric Byer returned to the Washington County Detention Center to ask Frost about a cousin who had a similar appearance to appellant; Frost was not aware of any such cousin. En route to Martinsburg, Detective Dewees and Detective Byer were notified by Deputy Barrick that the green minivan was parked in front of appellant's house, but it was in the process of leaving. Realizing "that the vehicle was a part of the—was a part of the crime, was a part of the crime scene, and we wanted to secure the vehicle for the purposes of a search and seizure warrant," Detective Dewees instructed Detective Swortwood to stop the vehicle. Due to possible "evidence from the crime scene, such as what the suspect was wearing, possibly a gun,

any blood evidence," Detective Dewees believed that the van was relevant to the crime scene. Additionally, the van had evidentiary importance because it could be identified by eyewitnesses to the murders.

At approximately 9:25 p.m. on October 19, 2002, on instructions from Detective Dewees, the green minivan was stopped. When he arrived at the scene at approximately 9:35 p.m., Detective Dewees was directed by the Martinsburg police to look at what appeared to be spots of blood on the hubcap of the vehicle. Although Corporal Dewees advised appellant that she was free to leave at least three times, she was told that the vehicle was being detained until a search warrant for the vehicle could be obtained. After Dewees and Corporal Kevin Miller returned to the Martinsburg police station and completed a search and seizure warrant for the green mini-van and another warrant for appellant's residence, accompanied by Detective Swortwood, they presented the warrants to the magistrate in Martinsburg, who issued the search and seizure warrants for the vehicle and the residence.

The testimony of Detective Jenkins of the Frederick County Sheriff's office essentially confirmed the testimony of Detective Dewees. Lee Prichard recounted the same version of events to Jenkins as had been communicated to Detective Dewees, i.e., that a black female with chicken pox marks on her face identified herself as the sister of Tracy Frost from New York and asked him to summon Deanne and the baby because she wanted to see the baby. Lee recounted to Detective Jenkins, as Collins had to Detective Dewees, that as the four approached the van, the masked female shot the two victims. In collaboration with Detective Dewees, Detective Jenkins determined that a 1997 dark green Chevrolet minivan was owned by appellant's father, Joe Nathan Daniels.

Joe Daniels, at a meeting with Detective Jenkins at the Maryland Correctional Institution in Hagerstown, confirmed his ownership of the minivan and that appellant had obtained the vehicle from his home in Martinsburg at approximately 2:15 that afternoon. He further confirmed that he had not

seen the vehicle since then and that he owned a 9 millimeter semiautomatic handgun, which he kept at his house. Detective Jenkins, accompanied by Joe Daniels, went to the home of Daniels' other daughter, Natasha, who told Detective Jenkins that appellant had come to her home at 4:00 p.m. that day. Detective Jenkins, while following Joe Daniels and Natasha in a separate car en route to Martinsburg, learned, via a radio transmission, that the minivan had been stopped.

The testimony of Detective Derek Creetinstine of the Frederick County Sheriff's office provided further confirmation of the version of events recounted by Detectives Dewees and Jenkins. He was told by Deborah Frey that she had heard shots and saw a green minivan flee from the scene. William Smouse described the getaway vehicle as a green minivan, whereas Tammy Bothe described it as a Caravan; Smouse, however, thought the short individual wearing headgear was a male. Larry Glass saw what "was possibly" a Dodge Caravan being driven by an African–American; Maria Precioso, who called 911, saw a dark green van leave the scene; Leda Harris saw a green minivan with a license plate number which began with the letter "M;" and Ron Krause recalled seeing a dark hunter green van that he believed to be a Dodge Caravan driven by an African–American female with marks or freckles on her medium complexion face and wearing a gray hooded sweatshirt. Krause gave chase, but broke off his pursuit of the fleeing vehicle when the driver turned and pointed a gun in his direction. Cassie Krause saw an individual wearing a hood shoot Deanne and bend down and shoot the baby, then flee in a dark green van. The information gathered as a result of the above interviews by Detective Creetinstine was conveyed to Detectives Dewees and Jenkins.

On the afternoon of October 19, 2002, advised by Detective Dewees of the murders and that the suspect was appellant who would probably be returning to 110 Georgetown Square Apartments in Martinsburg driving a green Chevy van, Detective Swortwood testified that he located the van at approximately 9:00 p.m., after being unsuccessful in locating it when he initially drove past the residence. As the vehicle began to

drive away from the residence, the officers stopped the van at approximately 9:25 p.m. and patted down appellant, advising her that she could leave, but that the van would be detained. According to Detective Swortwood, he and Detective Kevin Miller proceeded to the Martinsburg police station to prepare search warrants for the van and appellant's residence. Detective Miller testified that he assisted in the preparation of the search and seizure warrants and their presentation to the magistrate for his signature at sometime after midnight on October 20, 2002.

The motions court made the following findings of fact regarding the issue of probable cause to support the stop and seizure of appellant's father's van:

The first issue I guess is, is the very stop of the van which occurred in Martinsburg on the 19th of October at 9:25 p.m.

### Initial Investigation

The evidence is that at approximately 1500 or 3 p.m. on the 19th of October of 2002 there was a shooting of two individuals, Deanne Pritchard and Makayla Frost, and that officers began to arrive on the scene shortly thereafter. Detective Jenkins testified that he arrived on the scene at 3:12. Detective Dewees received a call at 3:15. Sergeant Creitenstein (phonetic) was on the scene at 3:40 and so forth. Within those first few minutes and I'll say up to 60 because I don't know that I have the precise times, a fair amount of information was collected by the many officers on the scene and, and from I guess to some extent personal observations, but from many people who were in the vicinity, not all of whom were witnesses. But what the deputies did know was that there were two people who were dead, that it appeared that they were dead by gunshot wounds. That was pretty obvious. They learned that the person who, that someone had been on the scene in a green van, that the someone was an African American. They had some ... information it was a male, but they also had information that it was a person with head gear. They had some information, however, that ... it was a woman and that information came from

Lee Pritchard [sic] and Patricia Collins as testified by Detective Jenkins, and someone who was about the same height as Deanne, about five feet, five inches.

### Description of Vehicle Involved

There was some fair amount of information about the van. It wasn't all consistent. As I recall, the only information as to its make or model, first of all it was, it was generally described as green. It think that was pretty consistent. But as far as a make and model, many people thought it was a Dodge Caravan. And in fact Lee said, the young man said that it was, either was or looked like a van he often saw in the nearby shopping center, and there was at least one description apparently, although it was not known to Detective Dewees he testified, that the van had gold wheels. It was known that the van ... had Maryland tags starting with M.

### Identification of Assailant

There was information that the person who did the shooting said I'm Tracy's sister. Whether it was Tracy Frost's sister ... or—but some connection to Tracy. It was told to Corporal Dewees by Ms. Collins that the family had returned from Washington County Detention Center. Ms. Collins told Detective Jenkins that there had been problems with Mr. Frost's former girlfriend ... and ... I don't recall whether the name was, the full name of [appellant] was given, but I do know that ... Detective Dewees left fairly soon. He arrived on the scene at 3:34 by his testimony and after he spent some time there he went on to the Washington County Detention Center to notify Tracy Frost of the deaths of his child and the mother of the child, and on the way he must have had notice, some knowledge of the name of [appellant] because he called or he was in communication with Motor Vehicle Administration or the dispatcher who was in communication with, who learned that [appellant] drove a BMW which she jointly owned with her father Joseph Daniels, and upon running further the name of

Joseph Daniels there was information that came back that he in fact owned a Chevrolet van and ... he testified that he learned in that whole process where he got the information specifically that [appellant] lived in Georgetown Square, at Georgetown Square in Martinsburg. So that, he has that information.

### *Motive for the Murders*

He drives to the Washington County Detention Center where he speaks to Tracy Frost. Tracy Frost tells him that two weeks earlier on the fifth of October he had told [appellant] not to come visit him again when she had been there at the Detention Center and she said you'll never see that baby again and he gave a description of [appellant] as being dark skinned with acne pockmarks and told, and said that she was capable of violence.... But he also said that [appellant's] father was a correctional officer and owned a green minivan.

### *Information Possessed by West Virginia Authorities*

Now this is the information known to Detective Dewees who then drives on to West Virginia where he meets with Sergeant Swortwood and Corporal Miller, two detectives over there. And he speaks to them and gives them information.... Detective Swortwood only knows at that point a name, a description of the van, an address and a tag number, and, and it appears to me that and my recollection is that that may have been what he testified to. But he also ... had talked to Detective Dewees at that time about what had gone on and Detective Miller in his testimony was well aware of these matters....

### *Preparation of Affidavit*

[Detective Miller] writes in his affidavit ... that in fact Detective Dewees arrived at 1745 hours, 5:45, and described, well, he advised of a double homicide and some other matters. Now certainly Detective Sergeant Swortwood knew there had been a double homicide. He testified

to that. . . . New paragraph. We know a name. [Appellant]. New paragraph. Green van. New paragraph. Maryland license M-something, whatever it was. Paragraph. 110 Georgetown Square. There clearly was some discussion of further details, and at that point the only, as far as I, as far as we know, the only effort that was made right then by the Martinsburg Police was to drive to 110 Georgetown Square and they did not observe the van at that point. In the meantime Detective Dewees left Martinsburg and came back to Maryland where he went to Washington County to verify a piece of information with Tracy Frost and . . . he now learns on his way back, he's at the Maryland West Virginia border stopped. He gets word that the van has been stopped and he testified that, well, we know the van was stopped at 7, at 9:25. . . . Corporal Dewees arrived about ten minutes from that stop. He had been notified by I believe then Corporal, now Sergeant Barrick who was in Martinsburg and he had been from 5:45, stayed there on.

*Court's Recap of Evidence of Probable Cause*

Now I'm gonna back up to earlier starting with the time Corporal Dewees first went to Martinsburg. He testified that he had spoken to the [S]tate's [A]ttorney and I, my recollection is that was about 7:00 and that the [S]tate's [A]ttorney had . . . told him there was probable cause. Let me try to put together consistent with what the law tells me I should do to analyze whether there's probable cause. . . . An African American person, a man or woman has been seen whose made a, whose verbalized a connection with Tracy, . . . Patricia Collins has seen it, shot these two individuals, has left the scene, has arrived and left the scene in a green van, has a connection with the father of the one victim and the boyfriend of the other, has made threatening statements about the child whose been shot, whose known to have ac—or who's likely to have access because her father owns a van which somewhat fits the description albeit not a caravan because it's a Chevrolet, and who was known to be in possession of that van that day because the father

said so, Joe Daniels. . . . Who lives in Martinsburg. And so therefore had the motive, had the possibility certainly of being there, driving in a vehicle that would be available, these events occurred very recently. Again, I don't know that the police at this point had evidence beyond a reasonable doubt or by a preponderance of the evidence to prove anything. But they had a substantial amount of information which would cause them to believe that that van might yield some information if they could get a closer look at it. Search it in the legal term. And I believe that they had that information, let me put it this way, that Corporal Dewees had that information from all that he collected by the time he arrived in Martinsburg at 5:45.

### *The Stop*

But by that point I believe as I said certainly Corporal Dewees had the information and communicated it to the Martinsburg Police, who did keep a look-out on 110 Georgetown Square and had determined by 9:00 that they would stop the van if it moved and it did. Sergeant Swortwood and Corporal Miller observed the van leaving the parking area of 110 Georgetown Square just about 9:25 and it drove two or three blocks. They had to turn around apparently. They followed it and followed it about two or three blocks where they stopped it with lights flashing believing that there was, had been a felony committed. They conducted what they call a felony stop. That is they approached from both sides of the van with weapons drawn. It doesn't apparently appear to be any problems with [appellant] getting out of the van. She did. They apparently holstered their weapons. Detective Miller conducted some Terry type frisk, determined that she had no weapons and she was outside of the van and yes, right away they announced to her that the van was going to stay where it was and they may have said that before they told her she was free to go, but they also promptly told her that she didn't have to stay. There were law enforcement officers coming from Frederick County, Maryland.

■■■■
■■■■

*The Seizure of the Van*

So they were very clear, unequivocal. The van was gonna stay where it was until they got a warrant and [appellant] was told that she could leave.... The van remained where it was until the search warrant was brought and that came I believe after 1:00.

Now as far as the observation of the blood spatter, I think my, what I've ruled so far pretty well covers that, .... But between that and the fact that the, this blood splatter was visible, albeit required a flashlight to see it, it was visible. It was outside the van. It was on the exterior and it was seen. I don't think detracts from the legitimacy of the search of the van that was, was conducted later.

As noted, the gravamen of appellant's assignment of error regarding the court's finding that the Martinsburg police had probable cause to stop appellant's minivan is twofold: (1) that the court, in its factual findings, stated that the officers "had a *substantial amount of information* which would cause them to believe that [the] van might yield some information if they could get a closer look at it," a standard which appellant describes as "close in nature to a reasonable suspicion standard [which] is certainly a far cry from reasonable cause"; and (2) that there was no testimony that, at the time of the stop, the Martinsburg police knew that the appellant was in possession of her father's green mini-van that afternoon.

Notwithstanding the motion judge's reference to "a substantial amount of information," after recounting the testimony adduced in support of a finding of probable cause, he said:

Let me try to put together consistent with what the law tells me I should do to analyze whether there's probable cause ... keep in mind the issue here isn't whether it's been proven by a preponderance of the evidence or beyond a reasonable doubt. It's a matter of putting together information to create these reasonable conclusions which one might draw on, on the information that's reliably avail—or is available and somewhat reliable. I'll say reliable, modify.

While the court's delineation of the standard of probable cause could have been more artfully expressed, it certainly comports with the conception that "[p]robable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar*, 338 U.S. at 175–76, 69 S.Ct. 1302.

Finally, regardless of the court's characterization of the quantum of information, the Court of Appeals has repeatedly articulated our role in evaluating a ruling on a motion to suppress:

> When the question is whether a constitutional right, such as the one here, has been violated, *we make our own independent constitutional appraisal.* We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case. *State v. Gee*, 298 Md. 565, 571, 471 A.2d 712, *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md. Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, *the relevant facts which we consider "are limited to those produced at the suppression hearing,"* see *Trusty v. State*, 308 Md. 658, 521 A.2d 749 (1987), which are most favorable to the State.

*Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990), *overruled in part on other grounds, Wengert v. State*, 364 Md. 76, 771 A.2d 389 (2001)(emphasis added).

Notwithstanding that we are bound by the court's factual findings that are supported by the evidence, we make our own independent determination of whether *the facts produced at the suppression hearing* support the court's denial of the

motion to suppress. We believe that the court made clear that the standard upon which it relied was the well-established standard of probable cause. But, even assuming, *arguendo,* that the court articulated an erroneous standard, the testimony elicited clearly supports the finding that the officers had probable cause to seize the vehicle.

▆▆▆ In claiming that the officers who stopped the minivan suspected of being the getaway vehicle lacked probable cause, appellant adroitly focuses on whether it was known by the Martinsburg police, at the time of the stop, that appellant was in possession of her father's green minivan when the crime occurred. Detective Swortwood testified that, on the afternoon of October 19, 2002, he was advised by Detective Dewees of the murders, that the suspect was appellant, who would probably be returning to 110 Georgetown Square Apartments in Martinsburg driving a green Chevy van, and he was provided with the number of the license plate. Detective Swortwood stopped the van at approximately 9:00 p.m.

Detective Dewees had earlier informed Detective Swortwood that "... the vehicle was a part of the crime scene and [the Frederick County officers] wanted to secure the vehicle for the purposes of a search and seizure warrant." The court, in summarizing the information it believed established probable cause, cited (1) several eyewitness identifications of the general description of the assailant and the getaway vehicle as a green minivan; (2) the identification of appellant by Frost as an unrequited ex-girlfriend who threatened that he would never see the baby (the victim, Makayla) again; and, most importantly, (3) that appellant's father owned a green minivan which matched the description of the vehicle used in the crime. Specifically referring to the above summary of the facts in support of probable cause, the court concluded:

> And I believe that they had that information, let me put it this way, that Corporal Dewees had that information from all that he collected by the time he arrived in Martinsburg at 5:45.
>
> Now the *Martinsburg Police, and I believe that they were aware of, of all this information.* If not every detail

I believe they had clearly this, most of this information. They didn't talk to the witnesses or neither did Corporal Dewees talk to all of the witnesses that are involved. *But by that point I believe as I said certainly Corporal Dewees had the information and communicated it to the Martinsburg Police,* who did keep a look-out on 110 Georgetown Square and had determined by 9:00 that they would stop the van if it moved and it did.

Regardless of whether anyone had specifically told the Martinsburg police that the minivan had been in appellant's possession at the time of the murders, they had been informed by Joe Daniels that appellant had picked up the vehicle and were specifically informed that the vehicle they had been instructed to stop was used in the murders and was considered part of the crime scene, possibly containing relevant evidence of the crime. With respect to the aggregation of information shared between investigating officers and law enforcement agencies, the Court held in *Jones v. State,* 242 Md. 95, 100, 218 A.2d 7 (1966):

> The rule as to when an officer may legally arrest a person, without a warrant, has often been stated by this Court. The decisions are reviewed in *Taylor v. State,* 238 Md. 424, 430, 209 A.2d 595 (1965). In *Farrow v. State,* 233 Md. 526, 532, 197 A.2d 434, 437 (1964), we said: *"If the police team working on the particular case had accumulated sufficient information to furnish probable cause for a reasonable man to believe that the alleged crime had been committed and that there was probable cause to believe that the defendant was involved therein, there was sufficient cause for his arrest."* It is the sufficiency of the information which the police organization, working as a team of which the arresting officer is a part, has placed on the lookout, which is determinative. *Johnson et al. v. State,* 238 Md. 528, 539, 209 A.2d 765 (1965) [sic] and cases therein cited.

(Emphasis added).

Armed with the information that the green minivan was believed to be part of the crime scene along with its tag

number, the Martinsburg police had more than ample information to support a finding of probable cause to stop and secure the vehicle.

### SEARCH WARRANT

Appellant next argues that the Maryland officers who executed the search warrant had no authority to do so under West Virginia law. The search warrant, she contends, was directed to West Virginia officers, resulting in the Maryland officers acting as private citizens. After the search warrant, prepared by Detectives Swortwood and Miller, had been signed by a magistrate, it was delivered to Officer Brian Rausch of the Martinsburg police, who had been stationed at the seized minivan, who then delivered a copy of the warrant to Joe Daniels, the owner of the vehicle. Present during the recovery of evidence from the vehicle, Officer Rausch testified that he documented what was taken from the vehicle and bagged by Frederick County officers; Officer Rausch then prepared a return for the warrant. In demonstrating that the search and seizure were done under the control of the Maryland authorities, appellant reproduces in her brief Officer Rausch's testimony that the Maryland crime scene investigator essentially gathered all of the evidence from the vehicle.

Appellant relies upon Section 62–1A–3 of the West Virginia Code, which governs the issuance of search warrants. That section provides:

A warrant shall issue only upon complaint on oath or affirmation supported by affidavit sworn to or affirmed before the judge or magistrate setting forth the facts establishing the grounds for issuing the warrant. If the judge or magistrate is satisfied that there is probable cause to believe that grounds therefore exist, he shall issue a warrant identifying the property and particularly describing the place, or naming or particularly describing the person, to be searched. *The warrant shall be directed to the sheriff or any deputy sheriff or constable of the county, to any member of the department of public safety or to any police*

*officer of the municipality wherein the property sought is located, or to any other officer authorized by law to execute search warrants.* It shall state the grounds or probable cause for its issuance and the names of the persons whose affidavits have been taken in support thereof. It shall command the officer to search forthwith the person or place named for the property specified, to seize such property and bring the same before the judge or magistrate issuing the warrant. Such warrant may be executed either in the day or night.

(Emphasis added).

Appellant also cites § 8–14–3 of the West Virginia Code, Powers, Authority and Duties of Law-enforcement Officials and Policemen. In prescribing the authority of "other officers authorized by law and in conferring powers to all members of the police force or department of a municipality," § 8–14–3 provides:

*The chief and any member of the police force or department of a municipality and any municipal sergeant shall have all of the powers, authority, rights and privileges within the corporate limits of the municipality with regard to the arrest of persons, the collection of claims, and the execution and return of any search warrant, warrant of arrest or other process, which can legally be exercised or discharged by a deputy sheriff of a county.* In order to arrest for the violation of municipal ordinances and as to all matters arising within the corporate limits and coming within the scope of his official duties, the powers of any chief, policeman or sergeant shall extend anywhere within the county or counties in which the municipality is located, and any such chief, policeman or sergeant shall have the same authority of pursuit and arrest beyond his normal jurisdiction as has a sheriff. . . .

(Emphasis added).

Appellant contends that "neither of these statutes gives a member of a police force outside the jurisdiction of West

Virginia the power to execute a West Virginia search warrant. Yet, that is precisely what occurred in this case."

The court, in denying the motion to suppress based on the claim that the Maryland officers were without authority, ruled as follows:

... Sergeant Swortwood testified that he left the scene at 11:25 that evening. That is, left the scene of the traffic stop. The officers went back. They typed up what they needed to make their applications for the warrant and the search warrant and the fugitive arrest warrant, and saw the magistrate just after 1:00, and I note the fugitive, the application for the fugitive warrant is based upon the information on the NCIC at 1 and 35 seconds on the 20th of October, and that delay has been testified was due to those issues I mentioned with preparing the, the application back here in Frederick. So they see the magistrate shortly after 1:00. The magistrate agrees and I've, as I've said I believe appropriately on probable cause to issue the search warrant. The—Patrolman Rausch had been called to the scene of the traffic stop and the warrant was delivered to him. And it was brought to him by Sergeant Swortwood and Corporal Miller. Patrolman Rausch had established the perimeter to secure the, the van and he then was present while officer, ah, Deputy First Class Myers and Deputy First Class Catliff (phonetic) then searched the van. I might quickly say that although some other officers had testified they had looked into the van from the outside, it's not been raised and I don't think it could legitimately be raised as any issue. As I said there was probable cause, but those were nothing more than glances from the outside looking in.

*At any rate the Frederick County deputies, two of them, conducted the search of the van,* and as they described it, they would describe to Patrolman Rausch what they were doing. He would then take notes on what they, they took from the van and I recognize that there was an issue with the number of gunshot residue tests made of the steering wheel because as I understand it, Deputy Myers conducted a test of each, each of the four quadrants of the steering

wheel. I think there was some confusion in his testimony. What I took it to be was he may not have said I'm doing the upper left, upper right, lower left, lower right, but he said I'm gonna take gun—residue tests of the steering wheel.

At any rate, there's nothing to tell me and *I don't believe that the fact that every physical act that was involved in the search itself was not done by a West Virginia officer invalidates that search.* It seems to me that Patrolman Rausch was there. He, and I don't know that it's too great a stretch to say that he acted through—maybe that is a stretch. But I'll say it appears to me that he acted as agents, or, or he acted through agents from Frederick County.

Now I accept Mr. Morrissette's, for purposes of my conclusion, characterization that they were private citizens at the time and place, but I don't believe that invalidates the search. It's to be conducted by a West Virginia law enforcement officer as described in the warrant. And there's apparently, ah, I, I took from the testimony that Patrolman Rausch was, was in close observation and in close proximity to what occurred as the search was being undertaken. I don't believe that the search was improperly conducted. Certainly, again the, anything in the exterior of the van was, was observable from the outset and I don't find fault with any of those items. In conclusion, I deny any motion, the motion to suppress the physical evidence that was obtained from the van for those reasons.

(Emphasis added).

In the instant case, the court concluded that the Frederick County police officers conducted their search of the vehicle owned by appellant's father pursuant to the West Virginia search warrant. The court concluded that the search of the vehicle and the seizure of evidence therefrom was "to be conducted by the West Virginia law-enforcement officers as described in the warrant." Noting that Martinsburg Patrolman Rausch was present during the execution of the warrant, the court decided that Officer Rausch had "acted through agents from Frederick County." Basing his decision on the

fact that Officer Rausch "was in close observation and in close proximity to what occurred as the search was being undertaken," the trial judge ruled, "At any rate, there's nothing to tell me and I don't believe that the fact that every physical act that was involved in the search itself was not done by a West Virginia officer invalidates the search."

Appellant's argument is based on the language of West Virginia Code § 62–1A–3, which confers authority only on the sheriff, deputy sheriff, constable, department of public safety official or police officer of the municipality wherein the property sought is located, or any other officer authorized by law to execute search warrants. Because the words, "of the municipality wherein the property sought is located," excludes law-enforcement officials from a foreign jurisdiction, the only other category which could include the Frederick County officers is "any other officer authorized by law to execute search warrants." The provisions of West Virginia Code § 8–14–3, insists appellant, defines "all the officers authorized by law" as "[t]he chief and any member of the police force, or department of a municipality and any municipal Sergeant" who "shall have all of the powers, authority, rights and privileges within the corporate limits of the municipality with regard to ... the execution and return of any search warrant...."

Appellant contends that, "Contrary to the opinion of the trial court, this is not a case where officer Rouse [sic] simply failed to perform 'every physical act that was involved in the search itself,' he did not perform *any* physical act that was involved in the search." Officer Rausch, she says, merely stood outside while the Maryland officers executed the search warrant issued by a West Virginia magistrate. Citing *Stevenson v. State*, 287 Md. 504, 509–13, 413 A.2d 1340 (1980), she acknowledges that a private citizen may make an arrest if he or she has reasonable grounds or probable cause to believe that a felony was committed and that the person whom he or she arrests committed it. Arguing that the Maryland officers were acting as private citizens when they conducted their

search of the van, she contends that "there simply is no right for citizens to 'seize' or 'search' the property of others."

The State answers that it was the Martinsburg Police Department that executed the West Virginia warrant and that it consented to the assistance of the Frederick County officers, who were most familiar with the investigation in the proper search of the vehicle. Although the State, in its brief, does not adopt the judge's determination that he accepted, "for the purposes of [his] conclusion, [appellant's counsel's] characterization that they were private citizens at that time and place," the State sets forth the excerpt from the record containing the court's conclusion.

*Stevenson v. State, supra,* cited by appellant, discusses the development, from the common law to the present, of the law of arrest by private citizens. There, the appellants sought to suppress "all evidence concerning the arrest, including any in-court identification" by District of Columbia officers who effectuated their arrest in the Marlow Heights area of Prince George's County, Maryland. The Court of Appeals, in its initial determination of the status of the District of Columbia officers, observed that, generally, a peace officer's authority to make an arrest is limited, in the absence of statutory authority expanding it, to the confines of the geographical unit of which he is an officer. *Id.* at 509, 413 A.2d 1340. After recognizing that "fresh pursuit" of a suspected felon historically provided a limited exception to an extra territorial arrest, the court observed that in all other situations, however, a peace officer who makes an arrest while in another jurisdiction does so as a private person, and may only act beyond his bailiwick to the extent that the law of the place of arrest authorizes such individuals to do so. *Id.* at 509, 413 A.2d 1340. The Court *in Stevenson* explained that, historically, before the advent of modern police departments and technology, arrests of individuals suspected of criminal acts was often performed by the citizenry:

The felon who is seen to commit murder or robbery must be arrested on the spot or suffered to escape. So, although not seen, yet if known to have committed a felony, and pursued

without warrant, he may be arrested by any person. And even when there is only probable cause of suspicion, a private person may without warrant, at his peril, make an arrest. *Wakely v. Hart*, 6 Binn. 316, 318–19 (Pa.1814).

*Stevenson*, 287 Md. at 519, 413 A.2d 1340 (emphasis added).

Since the District of Columbia officers were not in "fresh pursuit" of the suspects at the time they arrested them in Prince George's County, but were in the county on other business, the Court of Appeals explained that they no longer had authority to arrest as police officers. Their acts, therefore, had to be examined as those of private citizens. *Id.* at 510, 413 A.2d 1340. Citing *State v. O'Kelly*, 211 N.W.2d, 589, 595 (1973) (quoting 5 Am.Jur.2d, Arrest s 50, at 742), the Court concluded, "An officer who seeks to make an arrest without warrant outside his territory must be treated as a private person." The *Stevenson* Court ultimately held that, under the circumstances of that case, the District of Columbia police officers were functioning in a private rather than official capacity for the purpose of evaluating the legality of the arrests.

Notably, in footnote 3, 287 Md. at 511, 413 A.2d 1340, the Court carved out the following limitation on the above holding:

This statement should not be read as an endorsement of the Court of Special Appeals' conclusion that, for fourth amendment purposes, there is no "state action" involved whenever a private person makes an arrest. We do not reach that issue.

In responding to the argument by the appellants in *Stevenson*, that an extraterritorial arrest by a peace officer is not that of a private citizen if the officer was acting "under color of his office" at the time he made the arrest, the Court of Appeals concluded that a fair reading of the Florida decisions [1] led to the conclusion that the phrase "color of his office" applies not to the *modus operandi* of the arrest, but to

---

1. *State v. Crum,* 323 So.2d 673 (Fla.App.1975) (*per curiam* ); *Collins v. State,* 143 So.2d 700 (Fla.App.1962).

whether the official authority of the arresting officers was used to gain access to the information which led to the belief that an arrest should be made.

Although the appellants in *Stevenson* were seeking the suppression of evidence as the fruit of an allegedly illegal arrest, the issue before the court devolved upon the status of the officers in arresting Stevenson and his accomplice outside of their jurisdiction. Because there had been no prior collaboration with the Prince George's County police, any issue of whether the District of Columbia officers were acting as private citizens was clearly presented, uncomplicated by the legal implications of the extensive investigation that preceded the felony stop, search and seizure. Applying the above test, as to whether an officer is acting in his official capacity, as enunciated in *Stevenson*, however, it is beyond cavil that the Frederick County officers gained access to information which led to the belief that an arrest should be made as a result of their official authority as Maryland law enforcement officers engaged in the investigation of a double homicide. The Maryland officers, therefore, were not acting as private citizens when they conducted the search and seizure of the van. We now turn to the question of whether the role of Frederick County officers, in participating in the execution of the search warrant, unquestionably operating beyond their jurisdiction, rendered the search and seizure of the van invalid.

Appellant relies on the decision of the Florida District Court of Appeal, Second District, in *Hesselrode v. State*, 369 So.2d 348, 349–51 (1979). There, officers of the Longboat Key Police Department contacted a representative of the State's Attorney's Office who had drafted and prepared a search warrant for use by the police. However, the author of the warrant so strictly structured the warrant's terms as to have it issued and directed to an extremely closed category of persons, namely: "To: All and singular the Sheriff and/or Deputy Sheriffs of Manatee County, . . . ." The execution of the warrant and the ensuing search and seizure of contraband located within the described premises was conducted solely by

members of the Longboat Key Police Department. Section 933.08, Florida Statutes (1977) reads:

The search warrant shall [i]n all cases be served by any of the officers mentioned in its direction, but [b]y no other person except in aid of the officer requiring it, said officer being present and acting in its execution.

*Id.* at 350.

The appellant in *Hesselrode* argued that the warrant was fatally defective because it was directed to one category of peace officers and yet another category of police executed the warrant.

The Court held:

Valiantly as did the State Attorney's Office try here, it could not cure the original sin initiated by the hand of one of its members. The State would have us say that because there were members of the Manatee Sheriff's Office out and about the scene, then service of the warrant by the Longboat Key officers satisfied the statute and the constitution. The State points to *Nofs v. State,* 295 So.2d 308 (Fla. 2d DCA 1974). In *Nofs* the warrant was directed to "the Sheriff and/or Deputy Sheriffs of Pinellas County, Florida; and police officers of the City of St. Petersburg, Florida." Service of the warrant was made in the City of Gulfport by, and this is another twist, a St. Petersburg police officer. The warrant in *Nofs* was saved for, although the officer was technically out of his jurisdiction as a St. Petersburg police officer, he was, however, a bonded deputy sheriff. He thus belonged to one of the categories to which the warrant was directed. He also accompanied and assisted the other officers in searching the premises subject to the warrant. Thus, *Nofs* differs from this case.

A fair reading of the transcript of the hearing in the case *sub judice* leads us to but one conclusion and that is this investigation was solely the work of the Longboat Key Police Department and only incidentally others. *No member of the Manatee Sheriff's Office on July 4, 1977 participated in this investigation, the execution of the warrant or*

*the search of the premises subject to the warrant.* At best, what Manatee deputies were present were there as passive observers obtaining what intelligence information they could gather for the separate use of their own department.

*Id.* at 350–51 (emphasis added).

The Florida court's rationale in *Hesselrode* was that the statute was intended to prevent the loss of evidence, in consideration of the fact that no court official is present when evidence is seized and the judiciary has nothing to do with the direction of the officers as they accomplish their task. Contravention of the procedure mandated by the statute, the court said, results in suppressed evidence gathered by law enforcement agencies after many hours of hard labor. Lamenting that, "Save for the First and Fifth Amendments, the Fourth Amendment, from which we receive Section 12 to Article I of our own Florida Constitution, is probably most important to the liberty of all freedom loving citizens." *Id.* at 351. It concluded, "One cannot sit idly by and observe its meaning be slowly eroded away even by well-meaning police and prosecutors." *Id.*

The ills extant and the factual backdrop in *Hesselrode* are certainly not present in the case *sub judice*. At the outset, the State questions whether it is within this Court's jurisdiction to entertain appellant's claim under foreign law.[2]

---

2.  It should be noted that in *Hesselrode* the Florida District Court of Appeal construed a Florida statute, relying on Florida case law to the effect that "statutes authorizing searches and seizures must be strictly construed and affidavits and search warrants issued thereunder must strictly conform to the constitutional and statutory provisions authorizing their making an issuance." The decision further refers to the adoption by "the people of Florida in an even more organic part of our law in Florida" of Article I, Declaration of Rights, Section 12, of the Florida Constitution in providing for the manner of searches and seizures. The court was called upon to determine whether a warrant which restricted the category of peace officer who could execute the warrant was fatally defective because a category of peace officer not named in the warrant, acted exclusively in carrying out the search and seizure. Of note, the decision devolved upon the construction of a Florida statute rooted in the Florida State Constitution and involved two law enforcement agencies within the State of Florida and under the

**116**

In this regard, we note that *Hesselrode* turned on the restrictive language of Section 933.08, Florida Statutes, "but [b]y no other person except in aid of the officer requiring it, said officer being present and acting in its execution." Although we do not dismiss the State's jurisdictional issue out of hand, we shall assume that the issue is properly before us. The question, as we see it, is whether collaboration with a law-enforcement entity which clearly is authorized to execute a search and seizure warrant invalidates the warrant and compels the exclusion of the fruits of any such seizure. We hold that it does not.

It is undisputed that the evidence recovered from the vehicle owned by Joe Daniels was gathered principally by the Maryland crime scene officers. It is particularly important, however, that the safeguards against loss or alteration of evidence alluded to in *Hesselrode* were under the control of Officer Rausch, who was present at the scene, during the entire time that the evidence was being collected. It was, in fact, Officer Rausch who was responsible for documenting the items recovered and logging them in on the return to be filed with the court. Mindful that the double murders were being investigated and prosecuted by Maryland officials, they were in the unique position of knowing the underlying facts and what evidence was useful, relevant and probative. Notably, the language of the Florida statute providing for assistance of unauthorized personnel, "except in aid of the officer requiring it," we believe, is certainly instructive. Whether we view the role of the Frederick County officers as agents of the Martinsburg police in the execution of the search warrant or as simply assisting the local authorities, in light of their administrative/supervisory authority exercised, particularly by Officer Rausch, we perceive no error requiring invalidation of the search warrant and suppression of the evidence.

jurisdiction of its laws. Here, appellant seeks to have us invalidate a search and seizure based on an alleged violation of a West Virginia law governing the issuance of a warrant by a West Virginia law enforcement agency.

## DELAY IN PRESENTMENT

Citing the trilogy of decisions recently handed down by the Maryland Court of Appeals,[3] appellant next contends that, because of her unnecessary delay in presentment before a magistrate pursuant to Md. Rule 4–212, statements made by her were not voluntary and should be suppressed.

The State, for its part, counters that "there is no basis whatsoever on which to conclude that the Frederick County or Martinsburg police deliberately delayed [appellant's] presentment." In addition, the State, in alternatively arguing harmless error, points out in a footnote that "[a]ppellant's brief gives no indication as to the content or nature of [appellant's] statements that she sought to suppress."[4]

Maryland Rule 4–212(f) provides:

(f) Procedure—When Defendant in Custody.

(1) Same Offense. When a defendant is arrested without a warrant, the defendant shall be taken before a judicial officer of the District Court without unnecessary delay and in no event later than 24 hours after arrest. When a charging document is filed in the District Court for the offense for which the defendant is already in custody a warrant or summons need not issue. A copy of the charging document shall be served on the defendant promptly after it is filed, and a return shall be made as for a warrant.

---

**3.** *Williams v. State,* 375 Md. 404, 825 A.2d 1078 (2003); *Facon v. State,* 375 Md. 435, 825 A.2d 1096 (2003); *Hiligh v. State,* 375 Md. 456, 825 A.2d 1108 (2003).

**4.** The agreed statement of facts submitted by the prosecutor, upon which the trial court based its guilty verdict, contains only the following reference to a statement or confession by appellant:

The [appellant] was subsequently arrested and interviewed by members of the Frederick County Sheriff's Office on two occasions. On both occasions, the [appellant] indicated that she was in sole possession of the green mini van at the time of the murders.

The court, in its findings, however, opines that there was no coercive atmosphere or tactics employed in the interview or in the administering of *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] warnings, and does not disclose what appellant actually said in the interview.

When a charging document is filed in the circuit court for an offense for which the defendant is already in custody, a warrant issued pursuant to subsection (d)(2) of this Rule may be lodged as a detainer for the continued detention of the defendant under the jurisdiction of the court in which the charging document is filed. Unless otherwise ordered pursuant to Rule 4–216, the defendant remains subject to conditions of pretrial release imposed by the District Court.

Maryland Code, Courts and Judicial Proceedings, § 10–912 also speaks to the proper procedure prior to an arrestee's initial appearance before a judicial officer:

Bringing defendant before judge; failure

(a) A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by Title 4 of the Maryland Rules.

(b) Failure to strictly comply with the provisions of Title 4 of the Maryland Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession.

Prior to appellant's arrest at approximately 1:25 on the morning of October 20, 2002, the fugitive warrant was signed at 1:00 a.m., but appellant was not presented to a magistrate until 10:05 a.m. Examined at length on direct and on cross-examination about the availability of a magistrate in Martinsburg before whom appellant could have been taken after her arrest, Detective Swortwood testified that, with regard "to magistrate court where like a felony charge or a state warrant in our state is, people are not arraigned in the evening hours." The witness added, "We have a municipal city magistrate that is on call for city charges, not for fugitive charges, not for other state charges." Thus, according to Swortwood, no suspect arrested on a charge of murder at night in Martinsburg could be presented until the following morning.

Appellant relies on the holding in *Williams* that

[t]he same approach can easily and effectively be used with respect to the right to prompt presentment for an accused detained pursuant to an arrest. It would be a simple matter for the police to advise the accused as well of his or her right to prompt presentment before a District Court Commissioner, that the Commissioner is a judicial officer not connected with the police, and that the Commissioner, among other things, will inform the accused of each offense with which he or she is charged, including the allowable penalties attached to those charges, furnish the accused with a written copy of the charges, advise the accused of his or her right to counsel, make a pre-trial release determination, and if, as here, the accused has been charged with a felony beyond the jurisdiction of the District Court, of his or her right to a preliminary hearing before a judge. See Md. Rule 4–213. The police could inform the defendant that he or she may waive that right of prompt presentment and agree to submit to interrogation, subject to the right to end the interrogation at any time and demand to be taken promptly before a Commissioner. That kind of advice and a form for the written waiver can as easily be standardized as the *Miranda* advice and waiver have been, and should not take more than a few minutes to accomplish.

*    *    *

We hold that any deliberate and unnecessary delay in presenting an accused before a District Court Commissioner, in violation of Rule 4–212(e) or (f) must be given very heavy weight in determining whether a resulting confession is voluntary, because that violation creates its own aura of suspicion. The violation does not, of itself, make the confession involuntary or inadmissible. It remains a factor to be considered, along with any others that may be relevant, but it must be given very heavy weight.

*Williams,* 375 Md. at 432–34, 825 A.2d 1078.

Appellant acknowledges that, in interpreting *Williams,* the Court in *Facon,* 375 Md. at 441, 825 A.2d 1096, held that "the requirement of Maryland Rule 4–212(e) that a defendant shall

be taken before a judicial officer of the District Court without unnecessary delay begins only when the arrestee enters the prosecuting jurisdiction. . . ." *Ergo,* "for purposes of determining whether the rule has been violated, that period of time following arrest in a neighboring jurisdiction is not included in the time calculation." *Id.* Appellant maintains, however, that *Facon* provides for an important exception here pertinent:

We hold that the prompt presentment requirement under the Rule is not triggered where the defendant is held in custody outside of this State, absent evidence that officers of this State were working in conjunction with the other jurisdiction for purposes other than to secure extradition. In the instant case, the record does not reflect any collusion between the District of Columbia authorities and Prince George's County authorities apart from arranging for extradition. Petitioner was not interrogated until he arrived in Prince George's County. The delay in presenting petitioner therefore consisted of roughly 12 hours, commencing when Maryland State Police took custody of petitioner in Prince George's County.

There is a noteworthy, albeit narrow, exception to our holding that extraterritorial delays will not begin the running of time under Rule 4–212(e). As both Federal and other state courts have recognized, *the police cannot avoid the requirement of the presentment rule through collusion with a foreign jurisdiction.* *See United States v. Alvarez–Sanchez,* 511 U.S. 350, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994); *Anderson v. United States,* 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829 (1943); *State v. Guthrie,* 173 W.Va. 290, 315 S.E.2d 397 (1984). Where it is demonstrated that officers from this State are working in collaboration with the other jurisdiction, interrogating a defendant prior to his transfer, the presentment requirement may apply to the officers' activities. *See Alvarez–Sanchez,* 511 U.S. at 359, 114 S.Ct. at 1604, 128 L.Ed.2d 319 (stating that a confession obtained through collusion by state and federal agents to avoid presentment requirement would be suppressed).

*Id.* at 449–50, 825 A.2d 1096 (emphasis added)(footnote omitted).

In denying the motion to suppress appellant's statement, the court ruled:

Now at the time that the magistrate issued the search warrant she issued the fugitive arrest warrant and the testimony is that at 1:25 Sergeant Swortwood went to [appellant's] home again at 110 Georgetown Square and he arrested her, went into the house, arrested her without incident and transported her to the headquarters at Martinsburg. Police headquarters. There he processed her, took fingerprints, photographs and did those other things that he might do and he had been informed by the deputies, Deputy Dewees that they, that Deputy Dewees wanted to talk to [appellant] and so he escorted [appellant] to their presence where they spoke to her in an interrogation room, interview room.

\* \* \*

The detectives were aware that she was a high school graduate and that she was taking or had taken some college courses. She was calm. She was unemotional. Her responses seemed to be appropriate to the questions and she didn't ask to stop the proceedings. They talked in a rather, whether it was logical or not, a sequence. They talked about the events of that day and then Tracy Frost and then talked about, apparently, I believe talked about her vehicle, her car and eventually moved on to discussing a crime scene. Now [appellant] at some point after about two hours began to, ah, evidence some physical discomfort. Balled her fist up, kind of clutched her chest, either she was or, seemed to be short of breath, brushed off a first request for medical attention, but, but afterwards agreed on a follow-up question yes, she wanted some attention at that point. That particular interview ended and she was transported to the local hospital. I might go back just briefly to say the voluntary, the, the, the explanation of *Miranda* rights took

approximately five minutes. Began at 1:48 a.m. and completed, was completed at 1:53 a.m.

\*       \*       \*

Now before I talk about the presentment itself, I'm just going to move on to what I understand of the events then that transpired later that day. After she was released from the emergency room she was transported to the Eastern Regional Jail. Detective Dewees and Detective Jenkins returned that afternoon, this time armed with the Frederick County Sheriff's Office forms for cons, of constitutional rights. They went over them with her again, one after the other. [Appellant] initialed each one and then Detective Dewees initialed each one, and after they advised her again of her rights she agreed to talk. There was some reference again to the attorney on Monday, but nothing changed in that regard. She agreed to talk. They continued it. There were some questions. Why did you go back the second day? Well, they went back the second day I suppose, one reason given at any rate, I don't need to suppose, the, two reasons. One was they hadn't really felt they were finished from the night before and I think Detective Dewees was remarkably candid. We all know one of the reasons they went back. They wanted some more information if they could. Now maybe they would like to have heard answers change. I suspect that's the case. But that didn't mean they were gonna hear different answers at any cost. There's nothing about their motivations for this interview which cause it to be anything but appropriate and her responses to be anything but voluntary, and again with knowledge of the *Miranda* warnings which she had now been given for the second time.

The issues arise, that is of presentment, to the, the magistrate. Apparently, from the evidence before me the magistrate issued ... this fugitive warrant ... before 1:25 because that's when it was executed and the defense argues logically that gee, the magistrate was there at, right after 1:00. The thing was executed within a few minutes. Why wasn't she there when, why couldn't they have taken her

right back there? And that's a fair, fair question based on the evidence. We know that [appellant] was arrested at 1:25. She was taken back to the police station and from, we just have a general description of what was done in the processing. We know that the voluntary, her statement of *Miranda* rights started at 1:48 so there was approximately, that would be a 23 minute period of time from the arrest to the beginning of the interrogation or the interview. I will say candidly I think it's a fair question why the magistrate wouldn't have been available. Sergeant Swortwood, all I'm gonna take from his evidence is . . . he didn't figure there was one available. He didn't say he made any efforts, but he didn't figure there was a magistrate available. I take it from the Uniform Extradition Act that, that one should be taken before the magistrate. It doesn't say, it doesn't specify a period of time. . . . [B]ut it, it's clear to me that that's one of the things that should be done. I'm gonna use the word for the moment, promptly. . . . But the point is that events, the emergency events that occurred when [appellant] began to feel physical distress occurred from the testimony a couple, after a couple of hours. So somewhere close to 4:00 in the morning. At that point she was taken to the hospital. She certainly was not, there was a period of time when she couldn't have been taken before the magistrate. There is nothing that tells me that the very fact that she didn't first go to the magistrate requires me to, to suppress any statements made. It's a factor I should take into account and certainly I think it becomes more and more important as time goes on. But the fact that she had not been taken before the magistrate by 4 a.m. I don't believe invalidates the, the statement, the voluntariness of it. It doesn't cause me to feel that I should really consider that care, too carefully. It appears to me from the exhibit, State's Exhibit 3, that she was taken before the magistrate . . . 10:05 a.m. . . .

\* \* \*

So she was taken before the magistrate and after that then she was questioned again at the Eastern Regional Jail, and

I've said earlier I don't find anything about the facts of that interview or interrogation to cause me to believe that it was involuntarily given or given with anything other than full knowledge of her rights under the *Miranda* decision.

The State points out that the *Facon* Court explained, "Most of the accused's protections under the Rule relate to an application of Maryland law." *Facon,* 375 Md. at 448–49, 825 A.2d 1096. The assessment of probable cause for a Maryland offense, advisement of penalties, right to counsel under Maryland law, as well as federal law, and pretrial release determinations "are uniquely Maryland considerations and could not be performed adequately by a foreign judicial officer.... Rule 4–212(e) does not have extraterritorial effect." *Id.* Detective Swortwood testified that there is no judicial officer available to whom the police may present an individual arrested at night in Martinsburg for a felony or "state offense." In light of the recognition in *Facon* that unique features of the Maryland presentment process excuse extra-judicial arraignments on Maryland charges, Maryland Rule 4–212 is inapplicable where, as here, there was no attempt to circumvent the Rule.

Additionally, because of the onset of appellant's illness, the interview only lasted from 1:48 to 4:00 in the morning. Although the court stated that appellant "agreed to talk" and "they continued it," there is no indication of what appellant told the officers. The State, assuming *arguendo,* that any statement made by appellant was rendered involuntary as a result of a delay in presentment, directs our attention to the holding of the Supreme Court in *Arizona v. Fulminante,* 499 U.S. 279, 303, 111 S.Ct. 1246, 1261, 113 L.Ed.2d 302 (1991):

The Court today properly concludes that the admission of an "involuntary" confession at trial is subject to harmless error analysis. Nonetheless, the independent review of the record which we are required to make shows that respondent Fulminante's confession was not in fact involuntary. And even if the confession were deemed to be involuntary, the evidence offered at trial, including a second, untainted

confession by Fulminante, supports the conclusion that any error here was certainly harmless.

The collusion between jurisdictions contemplated in *Facon* is a collaboration in which law enforcement authorities in one jurisdiction insulate the authorities in a sister jurisdiction by keeping the arrestee beyond the reach of the laws of the sister jurisdiction. Not only was there no attempt to utilize jurisdictional barriers to circumvent Maryland Rule 4–212, but appellant overlooks the principal purpose of the Rule, to avoid an extended incommunicato custodial interrogation before an arrestee has the benefit of the advisement of a neutral judicial officer.

The sanction for violation of Rule 4–212(f) is exclusion of any statement obtained as a result of the deliberate delay in order to continue the interrogation before presentment. Although the evidence in this case was, to say the least, overwhelming, we acknowledge that appellant's admission to the police interrogators, on two occasions, that she was in sole possession of the green minivan at the time of the murders confirmed the lynchpin of the body of evidence that the detectives had assembled against her. The record, however, clearly demonstrates that the admission was not the product of a deliberate delay to obtain same.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**